UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- v. -

MAXIMILIEN DE HOOP CARTIER,

Defendant.

S2 24 Cr. 133 (MKV)

**THE GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION
TO THE DEFENDANT'S MOTION TO DISMISS THE INDICTMENT**

JAY CLAYTON
United States Attorney
Southern District of New York
26 Federal Plaza
New York, New York 10278

Jennifer N. Ong
Assistant United States Attorney
    *-Of Counsel-*

# TABLE OF CONTENTS

FACTUAL BACKGROUND ................................................................................................ 1

PROCEDURAL BACKGROUND.................................................................................... 5

ARGUMENT ...................................................................................................................... 6

I.    The Court Should Deny the Defendant's Motions to Dismiss the Indictment ................... 6

    A.    Applicable Law ............................................................................................ 6

    B.    Count Three Sufficiently Alleges a Scheme to Defraud ........................................ 8

        1.    Count Three Alleges a Scheme to Obtain Property Under a Bank's Control ................................................................................................... 9

        2.    A Customer's Account is Property Owned By the Bank ......................... 12

        3.    Count Three Adequately Alleges False Statements ................................. 15

    C.    Counts Two and Four Sufficiently Allege Offenses ............................................. 17

CONCLUSION.................................................................................................................... 19

## TABLE OF AUTHORITIES

**Federal Cases**

*Boyce Motor Lines, Inc. v. United States*, 342 U.S. 337, 343 n.16 (1952) .............................. 6, 20

*Ciminelli v. United States*, 598 U.S. 306 (2023) .................................................... 10, 12

*Costello v. United States*, 350 U.S. 359 (1956).......................................................................... 7

*Hamling v. United States*, 418 U.S. 87 (1974)........................................................................... 8

*Shaw v. United States*, 580 U.S. 63 (2016) ......................................................................... 14, 15

*United States v. Aiyer,* 33 F.4th 97 (2d Cir. 2022).......................................................................... 18

*United States v. Alfonso*, 143 F.3d 772 (2d Cir. 1998) .............................................................. 8, 18

*United States v. An*, 733 F. Supp. 3d 77 (E.D.N.Y. 2024).................................................. 13, 15, 16

*United States v. Bankman-Fried*, 680 F. Supp. 3d 289 (S.D.N.Y. 2023) ................................ 12, 16

United States v. Braeger, No. 21-CR-233, 2023 WL 2136722 (E.D. Wis. Feb. 21, 2023).......... 17

*United States v. Dawkins*, 999 F.3d 767 (2d Cir. 2021) ............................................................. 9, 19

*United States v. De La Pava*, 268 F.3d 157 (2d Cir. 2001) ......................................................... 1, 7

*United States v. Goldberg*, 756 F.2d 949 (2d Cir. 1985) ................................................................. 6

*United States v. Juwa*, 508 F.3d 694 (2d Cir. 2007)........................................................................ 9

*United States v. Kwok*, No. 23 CR. 118 (AT), 2024 WL 1407057 (S.D.N.Y. Apr. 2, 2024)...11, 15,

    16

*United States v. Motovich*, No. 21-CR-497 (WFK), 2024 WL 2943960 (E.D.N.Y. June 11, 2024)

    ...................................................................................................................................... 12, 15

*United States v. Navarro*, 551 F. Supp. 3d 380 (S.D.N.Y 2021)................................................... 20

United States v. Perez, 575 F.3d 164 (2d Cir. 2009) ....................................................................... 9

*United States v. Phillips*, 690 F. Supp. 3d 268 (S.D.N.Y. 2023) .................................................. 13

*United States v. Sampson*, 898 F.3d 270 (2d Cir. 2018).............................................................. 18

*United States v. Stringer*, 730 F.3d 120 (2d Cir. 2013) .........................................................7, 8, 11

*United States v. Vilar*, 729 F.3d 62 (2d Cir. 2013) ......................................................... 7

*United States v. Walsh*, 194 F.3d 37 (2d Cir. 1999) ......................................................... 8

*United States v. Walters*, 910 F.3d 11 (2d Cir. 2018) ......................................................... 9

*United States v. Wey*, No. 15-CR-611 (AJN), 2017 WL 237651 (S.D.N.Y. Jan. 18, 2017) ...........11

*United States v. Williams*, 504 U.S. 36 (1992) ............................................................. 9

*United States v. Yannotti*, 541 F.3d 112 (2d Cir. 2008) ......................................................... passim

**Rules**

Fed. R. Crim. P. 12(b...................................................................................................... 6

Fed. R. Crim. P. 7(c)(1)................................................................................................ 12

Fed. R. Crim. Proc. 7(c)................................................................................................ 1

The Government respectfully submits this memorandum of law in opposition to the defendant Maximilien de Hoop Cartier's motion to dismiss the indictment (the "Motion to Dismiss" or "Def. Mot."). (Dkt. No. 87 ("Def. Mot.")).  The defendant's motion should be denied. The defendant comes nowhere near meeting his heavy burden to obtain dismissal of the Indictment, which, as this Court knows well, is an "extraordinary remedy" reserved for "extremely limited circumstances implicating fundamental rights." *United States v. De La Pava*, 268 F.3d 157, 165 (2d Cir. 2001).  Many of the defendant's arguments in favor of dismissal constitute factual assertions and characterizations of the Indictment's allegations that go beyond the face of the indictment and are more appropriate issues for trial. The Indictment, which tracks the language of the statute and contains a detailed to wit clause, is more than sufficient to satisfy the pleading requirements under Rule 7(c) of the Federal Rules of Criminal Procedure.  *See United States v. Yannotti*, 541 F.3d 112, 127 (2d Cir. 2008) (to satisfy the pleading requirements of Fed. R. Crim. Proc. 7(c), "an indictment need do little more than to track the language of the statute charged and state the time and place . . . of the alleged crime.").

## FACTUAL BACKGROUND

Since at least in or about January 2020, the defendant Maximilien de Hoop Cartier has played a key role in a sophisticated money laundering network (the "Network") that utilized the U.S. financial system to launder the proceeds of illicit activity through the United States to Colombia, among other countries. Specifically, the defendant used several U.S.-based shell companies and U.S.-based bank accounts to act as an over-the-counter cryptocurrency exchange to convert cryptocurrency—usually Tether or USDT[1]—to  fiat currency, which the defendant then

---

[1] Tether is a Stablecoin or a fiat-collateralized token that is backed by fiat currencies or currencies issued by governments like the U.S. dollar or Euro.

wired to bank accounts in other countries, including Colombia. At times, the defendant used fake technology services contracts between his Shell Companies and the Colombia-based shell companies to justify wires to Colombia-based bank accounts. (Dkt. No. 1 (the "Compl.") ¶¶ 18(b), 23).

As part of this money laundering operation, the defendant controlled, operated, or was connected to—via incorporation documents, documents submitted to the Internal Revenue Service ("IRS"), or applications submitted to U.S. financial institutions—several shell companies incorporated in Delaware by the same registered agent (the "Shell Companies"). (Compl. ¶ 13(c)). The Shell Companies include:

1. Vintech Capital LLC ("Vintech Capital"), which was incorporated in or about July 2018. Vintech Capital purports to provide services in the financial sector and claims to be a "Leader in Institutional Sized Liquidity Over the Counter (OTC) for the Digital Asset Markets."[2]

2. VC Innovated Technologies LLC ("VC Innovated"), which was incorporated in or about September 2019. According to documents submitted to the IRS, VC Innovated purports to provide the following services: "Blockchain Technology, AI [artificial intelligence], VR [virtual reality]."

3. AZ Technologies LLC ("AZ Technologies"), which was incorporated in or about January 2020. According to documents submitted to the IRS, AZ Technologies purports to provide the following services: "Software, Hardware, AI [artificial intelligence], and Blockchain Technology."

4. Softmill LLC ("Softmill"), which was incorporated in or about January 2020. According to documents submitted to the IRS, Softmill purports to provide the following services: "Software, Hardware, AI [artificial intelligence], and Blockchain Technologie [sic]."

5. Sun Technologies LLC ("Sun Technologies"), which was incorporated in or about November 2020. According to documents submitted to the IRS, Sun Technologies provides "Digital Technology Solution."

6. Bullpix Solutions LLC ("Bullpix"), which was incorporated in or about November 2020. According to documents submitted to the IRS, Bullpix

---

[2] https://www.linkedin.com/company/vintechcapital/about/.

purports to provide the following services: "Digital advertising, IT platform, Software."

(Compl. ¶ 13).

The defendant also opened several U.S.-based bank accounts for each of the Shell Companies and, in doing so, represented himself to be the figurehead of a legitimate business involved in the technology or software industry. (Compl. ¶¶ 14, 27). The detail that the defendant provided to the banks varied by institution. Some examples are included below:

- The defendant opened multiple bank accounts at a particular U.S. bank ("Bank-1"). As part of the account opening application process, Bank-1 asked its customers to provide their North American Industry Classification ("NAICS") Code and, in some cases, Bank-1 asked for a more detailed business description. In or about August 2018, the defendant opened an account at Bank-1 for Vintech Capital. The defendant listed an NAICS Code of "Software Publishers – 511210" and the following detailed description: "The business provides storage on servers to businesses. Businesses can pay for storage on servers th [sic]." In or about October 2019, the defendant opened an account at Bank-1 for VC Innovated and listed an NAICS Code of 511210 and a NAICS description of "Software Publishers." The defendant provided the following detailed description: "APP DEVELOPMENT AND FIN TECHNOLOGY." When asked to list countries of significant clients, the defendant put the United States. In or about February 2020, the defendant opened an account at Bank-1 for AZ Technologies. The defendant provided the NAICS code and description of "Software Publishers" and 511210, and the following detailed description: "Technology." (Compl. ¶ 14(a)-(c)).

- The defendant opened multiple bank accounts at another U.S. bank ("Bank-2") for VC Innovated, AZ Technologies, and Softmill. In its account opening documents, Bank-2 asked potential customers to describe the "Nature of Business." In completing the application, the defendant stated the following: In or about November 2019, the defendant listed "Software Publishers" for VC Innovated. In or about March 2020, the defendant listed "Data Processing, Hosting, and Related Services" in separate applications for AZ Technologies and Softmill. (Compl. ¶ 14(d)). In or about May 2020, a representative of Bank-2 asked the defendant to explain VC Innovated's activity that was going to a "High Risk Country (Colombia)" and VC Innovated's transaction activity between Hong Kong and Colombia. The representative also asked the defendant to list the companies he worked with in the United States and Colombia, and the services the Colombian companies provided. As part of his scheme, the defendant responded with a presentation about VC Innovated and then told the representative that VC Innovated worked with Google LLC, Facebook, Inc., Gemini Trust Company, LLC, and Microsoft Corp. in the United States.

- In or about November 2021, the defendant opened a bank account for Sun Technologies at another U.S. bank ("Bank-3"). The defendant indicated "SOFTWARE DEV COMPANY" for "Nature of Business" and "Services-Business" for "Type of Industry." The defendant and another individual ("Individual-1") were listed as signers on the account. The defendant's Sun Technologies account at Bank-3 was enrolled in a rewards program and had a 3-month average reward balance of approximately $157,703. (Compl. ¶ 14(e)).

- In or about November 2021, the defendant opened an account for Bullpix at a third U.S. bank ("Bank-4"). The defendant and Individual-1 were listed as owners on the account. In its business account application, Bank-4 required its customers to provide information about the business's industry and a description of the business. Bullpix listed "Professional, Scientific, and Technical Services" for its industry and "Software development and implantation" for its description of business. As part of his scheme, on or about March 2023, the defendant sought to optimize Bullpix's account at Bank-4 to potentially save money on wire transfers. Bank-4 understood that Bullpix offered "business to business services" along with "Business intelligence, IT strategies, personal computing, cloud solutions. VR & AI , PWA y [sic] Chatbot, Automation of marketing processes and cloud & virtualization." Moreover, Bank-4 understood that the defendant's "current customers" included "Global X, Google, [and] Apple." In addition, in order to optimize his account, the defendant provided fake bank statements purportedly for VC Innovated at Bank-3. In reality, those bank statements were for Sun Technologies and contained the account number and account information for Sun Technologies— not VC Innovated. (Compl. ¶ 14(f)).

In addition, the defendant has explained why he makes these misrepresentations to U.S. financial institutions. In or about October 2023, the defendant had several recorded conversations with an undercover law enforcement officer ("UC-1"), who the defendant believed needed to liquidate a large amount of USDT. The defendant explained to UC-1 that he used satellite companies—*i.e.*, one of the Shell Companies—that purports not to be in the cryptocurrency business to remit payments. The defendant explained that he uses a satellite company because banks tend to deny transfers or close accounts when the banks learn that the defendant is working with cryptocurrency-friendly banks. In another recorded conversation in or about December 2023, the defendant explained to UC-1 that his companies "basically do cryptocurrency" but that he does not disclose that to banks because banks would close his accounts. The defendant further explained

that he creates a new company and does business under that name to avoid issues and bank accounts being closed. (Compl. ¶ 28).

Using this network of U.S.-based shell companies and corresponding bank accounts, the defendant helped the Network launder hundreds of millions of dollars through the U.S. financial system. (Compl. ¶¶ 18-25).

## PROCEDURAL BACKGROUND

On February 20, 2024, a five-count criminal complaint was filed in the Southern District of New York charging the defendant with (i) conspiracy to commit money laundering; (ii) money laundering; (iii) bank fraud; (iv) operation of an unlicensed money transmitting business; and (v) engaging in a monetary transaction in property derived from specified unlawful activity.  (Dkt. No. 1).  The defendant was arrested on February 22, 2024, in Miami, Florida and presented the next day before Judge Jonathan Goodman of the Southern District of Florida. Judge Goodman temporarily detained the defendant and set a pretrial detention and removal hearing for February 28, 2024, which was rescheduled to March 4, 2024.  At that hearing before Judge Lisette Reid, the defendant consented to detention and waived his removal hearing.  The defendant was thereafter detained at the Federal Detention Center in Miami, Florida pending his removal to the Southern District of New York.

On March 7, 2024, a grand jury returned a six-count superseding indictment (the "Indictment") charging the defendant and five other defendants.  The Indictment charges the defendant with (i) conspiracy to commit money laundering from at least in or about May 2023 to at least in or about November 2023, in violation of 18 U.S.C. § 1956(h); (ii) money laundering since at least in or about January 2020, in violation of 18 U.S.C. §§ 1956(a)(1)(B)(i) and 2; (iii) bank fraud since at least in or about January 2020, in violation of 18 U.S.C. §§ 1344 and 2; (iv) engaging in a monetary transaction in property derived from specified unlawful activity on or

about August 22, 2023, in violation of 18 U.S.C. §§ 1957 and 2; and (v) operation of an unlicensed money transmitting business since at least in or about January 2020, in violation of 18 U.S.C. §§ 1960 and 2.  (Dkt. No. 16 (the "Indictment")).

On May 22, 2024, the defendant appeared before Magistrate Jennifer E. Willis, where he was detained on consent.  (Dkt. No. 26).  On June 12, 2024, the defendant was arraigned on the Indictment.

## ARGUMENT

### I.    The Court Should Deny the Defendant's Motions to Dismiss the Indictment

The defendant moves to dismiss Counts Two, Three, and Four in the Indictment on the basis that the Indictment's allegations are legally defective. As discussed below, the charges track the relevant statutes and the defendant's alleged misconduct falls squarely within what these statutes prohibit.

### A.    Applicable Law

On a pretrial motion to dismiss pursuant to Fed. R. Crim. P. 12(b), the allegations of the indictment must be taken as true.  *See Boyce Motor Lines, Inc. v. United States*, 342 U.S. 337, 343 n.16 (1952); *United States v. Goldberg*, 756 F.2d 949, 950 (2d Cir. 1985).[3]  The law is well settled that "[a]n indictment returned by a legally constituted and unbiased grand jury . . . if valid on its face, is enough to call for trial of the charge on the merits." *Costello v. United States*, 350 U.S. 359, 363 (1956).  The dismissal of an indictment is an "extraordinary remedy reserved only for extremely limited circumstances implicating fundamental rights." *De La Pava*, 268 F.3d at 165.

---

[3] Unless otherwise noted, case quotations omit internal quotation marks, citations, and previous alterations.

"Pursuant to Federal Rule of Criminal Procedure 7, 'the indictment or information must be a plain, concise, and definite written statement of the essential facts constituting the offense charged.'" *United States v. Vilar*, 729 F.3d 62, 80 n.16 (2d Cir. 2013) (quoting Fed. R. Crim. P. 7(c)(1)).  To satisfy this rule, "an indictment need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime." *United States v. Yannotti*, 541 F.3d 112, 127 (2d Cir. 2008). Only in "very rare cases," such as those involving a refusal to answer questions before Congress, must an indictment specify "how a particular element of a criminal charge will be met." *United States v. Stringer*, 730 F.3d 120, 125-26 (2d Cir. 2013) (discussing the special case of *Russell v. United States*, 369 U.S. 749 (1962)). Otherwise, "[a]n indictment is sufficient if it 'first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense.'" *Id.* at 124 (quoting *Hamling v. United States*, 418 U.S. 87, 117 (1974)); *see also Yannotti*, 541 F.3d at 127.

Where a defendant has been given sufficient notice of the charges against him by means of, for example, a criminal complaint or discovery, prejudice will not have been shown, and the indictment should stand. *See, e.g.*, *Stringer*, 730 F.3d at 124-25 ("[Defendant] was sufficiently informed to defend against the charges and to be protected against the risk of double jeopardy" where the government provided a criminal complaint that "outlined his crimes in detail" and disclosed his victims' names in advance of trial); *Yannotti*, 541 F.3d at 127 (finding defendant was "well aware of the government's theory of the loansharking conspiracy" and the identities of victims and co-conspirators through the indictment and discovery); *United States v. Walsh*, 194 F.3d 37, 45 (2d Cir. 1999) ("[W]here the indictment has been found even minimally sufficient, a

court may look to the record as a whole in determining whether the defendant is protected from double jeopardy in a subsequent prosecution and whether the defendant has had an adequate opportunity to prepare his defense.").

Moreover, it is well settled that, "[u]nless the government has made what can fairly be described as a full proffer of the evidence it intends to present at trial," a facially valid indictment is not subject to challenge based on the quality or quantity of evidence. *United States v. Alfonso*, 143 F.3d 772, 776 (2d Cir. 1998); *see United States v. Williams*, 504 U.S. 36, 54 (1992); *United States v. Perez*, 575 F.3d 164, 166 (2d Cir. 2009). This rule exists because indictments are "not meant to serve an evidentiary function," but rather, "to acquaint the defendant with the specific crime with which he is charged, allow him to prepare his defense, and protect him from double jeopardy." *United States v. Juwa*, 508 F.3d 694, 701 (2d Cir. 2007). Accordingly, "at the indictment stage, [courts] do not evaluate the adequacy of the facts to satisfy the elements of the charged offense." *United States v. Dawkins*, 999 F.3d 767, 780 (2d Cir. 2021). Rather, "[t]hat is something [courts] do after trial." *Id.* This is consistent with the well-established principle that summary judgment proceedings "do[] not exist in federal criminal procedure." *Id.*

In short, dismissal of the Indictment is a "drastic remedy that should be utilized with caution and only in extreme cases." *United States v. Walters*, 910 F.3d 11, 26 (2d Cir. 2018).

### B.    Count Three Sufficiently Alleges a Scheme to Defraud

The defendant seeks to dismiss Count Three on the basis that the defendant's scheme does not involve obtaining a "traditional property interest." (Def. Mot. at 12). However, this count—as the defendant concedes (*see* Def. Mot. at 1, 13)—tracks the relevant statutory language, which alone is a basis to deny the motion. *See Yannotti*, 541 F.3d at 127. Having no basis to challenge this count as charged, the defendant argues that the Indictment must be dismissed because it is either premised on (i) the "right-to-control" theory of wire fraud and therefore the Indictment

would not sufficiently allege a property interest under the Supreme Court's recent decision in *Ciminelli v. United States*, 598 U.S. 306 (2023); or (ii) the theory that use of one's own bank account can constitute deprivation of property, despite acknowledging that no controlling authority prohibits such a theory. (Def. Mot. at 12-26). Finally, the defendant makes a last-ditch effort to dismiss Count Three by arguing that the Court should make a premature factual determination that his misrepresentations to various banks were not actually misrepresentations at all.  These arguments are meritless and the Court should deny the defendant's motion to dismiss Count Three.

        1.    <u>Count Three Alleges a Scheme to Obtain Property Under a Bank's Control</u>

Count Three, the bank fraud count, alleges a scheme to obtain "moneys, funds, credits, assets, securities, and other property owned by, and under the custody and control of, such a financial institution, by means of false and fraudulent pretenses, representations, and promises" that accounts he opened at financial institutions "would be used primarily for software or technology related transactions, knowing that the accounts would be used to transmit funds on behalf of an unlicensed money remitting business related to the operation of a cryptocurrency exchange." (Indictment ¶ 4).  Because paragraph 4 of the Indictment tracks the statutory language of 18 U.S.C. § 1344, it properly alleges that the defendant's scheme was to obtain "property" in violation of the bank fraud statute. *See Yannotti*, 541 F.3d at 127.

In support of his argument that something more is required after *Ciminelli*, the defendant cites *Russell*, a six-decade-old precedent that the Second Circuit has characterized as "one of the very rare cases in which an indictment that tracked the statutory language and furnished the pertinent dates was held insufficient." *Stringer*, 730 F.3d at 125. However, as the Second Circuit explained, *Russell* addressed the "special nature of a charge of refusal to answer questions in a congressional inquiry" and should not be construed "as a broad requirement applicable to all criminal charges that the indictment specify how each essential element is met."  *Stringer*, 730

F.3d at 125-26 ("[F]or certain statutes specification of how a particular element of a criminal charge will be met (as opposed to categorical recitation of the element) is of such importance to the fairness of the proceeding that it must be spelled out in the indictment, but there is no such universal requirement."); *United States v. Wey*, No. 15-CR-611 (AJN), 2017 WL 237651, at *5 (S.D.N.Y. Jan. 18, 2017) (distinguishing *Russell* and finding "no basis to depart from the usual sufficiency framework"). The defendant does not cite any legal authority for the proposition that *Russell*'s enhanced pleading requirements are applicable in the bank fraud context, even post-*Ciminelli*, and the Government is aware of none.

To the contrary, in the context of bank fraud, courts in this Circuit have routinely found indictments to be sufficient so long as they track the language of the statute. *See, e.g.*, *United States v. Kwok*, No. 23 CR. 118 (AT), 2024 WL 1407057, at *9 (S.D.N.Y. Apr. 2, 2024) ("[A]n indictment sufficiently states a bank fraud conspiracy offense where it alleges that the defendant conspired to send false information to a financial institution to disguise the true nature of an account and to obtain funds from that account that were in the custody and control of the financial institution."); *United States v. Motovich*, No. 21-CR-497 (WFK), 2024 WL 2943960, at *4 (E.D.N.Y. June 11, 2024) ("The Bank Fraud Counts plainly track the language of the applicable underlying statute and state the time and place of the alleged bank fraud offenses and incorporate the Indictment's further factual allegations of Defendants' alleged scheme, thereby properly stating offenses under Federal Rule of Criminal Procedure 7(c)."); *United States v. Bankman-Fried*, 680 F. Supp. 3d 289, 305 (S.D.N.Y. 2023) ("Count Nine tracks the statutory language of Section 1344(2) and sufficiently alleges that the defendant conspired to obtain "money or property" in violation of the statute.").

The defendant nevertheless argues that the Government's theory "is possibly one prohibited by *Ciminelli*"—that is, the defendant argues that Count Three should be dismissed based on the mistaken premise that the "property" alleged to have been obtained was the bank's "right to control" its asset, which is no longer a viable theory of "property" in the wake of the Supreme Court's recent decision in *Ciminelli*. (Def. Mot. at 9-13). *Ciminelli* rejected the "Second Circuit's 'right to control' theory, under which the Government can establish wire fraud by showing that the defendant schemed to deprive a victim of potentially valuable economic information necessary to make discretionary economic decisions." *Id.* at 309. *Ciminelli* has no bearing on the bank fraud charge here, which alleges a scheme to obtain "money, funds, credits, assets, securities, and other property" in the bank's custody, and not a scheme to defraud the bank by depriving it of valuable economic information, as the defense mistakenly asserts. (Def. Mot. at 16). *See also Ciminelli*, 598 U.S. at 317 (Alito, J., concurring) ("I do not understand the Court's opinion to address fact-specific issues on remedy outside the question presented, including: (1) petitioner's ability to challenge the indictment at this stage of proceedings; (2) the indictment's sufficiency . . . ."); *United States v. An*, 733 F. Supp. 3d 77, 91 (E.D.N.Y. 2024) ("*Ciminelli* concerned an "instructional error, not the sufficiency of an indictment."). As discussed further below, the Indictment's detailed *to wit* clause is fully consistent with the Government's theory that the banks were deprived of traditional property rights: it specifies, among other things, that funds were transmitted out of the defendant's accounts as a result of the fraud scheme.

Moreover, while the defendant is critical of the Government's decision to seek a legally sufficient indictment that tracked the language of the statute, rather than a lengthier indictment (Def. Mot. at 4, 13-16), "[i]t is not the function of an indictment to inform the defendant of the evidence or the facts which the Government will use to prove its case." *United States v. Phillips*,

690 F. Supp. 3d 268, 277 (S.D.N.Y. 2023). In fact, "the Government need not show its hands before trial because an indictment need provide the defendant only a plain, concise, and definite written statement of the essential facts constituting the offense charged." *Id.*; Fed. R. Crim. P. 7(c)(1). Accordingly, because Count Three sufficiently alleges a bank fraud offense, the Court should deny the defendant's motion to dismiss.

> 2.    <u>A Customer's Account is Property Owned By the Bank</u>

Unable to challenge Count Three as charged, the defendant also argues that "merely opening an account based on false statements" is not sufficient to allege a deprivation of a traditional property right. (Def. Mot. at 17). The defendant argues that that there is no controlling authority for this proposition and that it would be "an unwarranted extension of existing law." (*Id.*). But that is incorrect for two reasons: the Indictment alleges that the defendant did more than open an account and there is controlling authority to support such a charge.

The Indictment alleges that the defendant devised a scheme to obtain money or property from financial institutions by falsely representing to various banks that the accounts would be used primarily for software or technology related transactions while knowing that they would be used to operate an unlicensed money remitting business related to a cryptocurrency exchange. (Indictment ¶ 4). The Indictment thus alleges that the defendant's scheme involved not only opening accounts but also their continued use in accordance with his misrepresentations so the defendant could operate his unlicensed money remitting business.

The Supreme Court in *Shaw v. United States*, 580 U.S. 63 (2016), is illustrative. In *Shaw*, the Supreme Court described that once a "customer deposits funds" in the bank, "the bank, too, had property rights in" that account. *Id.* at 66. As the Court explained:

> When a customer deposits funds, the bank <u>*ordinarily*</u> becomes the owner of the funds and consequently has the right to use the funds as a source of loans that help the bank earn profits (though the

12

> customer retains the right, for example, to withdraw funds).
> <u>*Sometimes*</u>, the contract between the customer and the bank provides
> that the customer retains ownership of the funds and the bank merely
> assumes possession. But even then the bank is like a bailee, say, a
> garage that stores a customer's car. And as bailee, the bank can assert
> the right to possess the deposited funds against all the world but for
> the bailor (or, say, the bailor's authorized agent).

*Id.* (emphasis added). In other words, the *Shaw* Court recognized that banks <u>*ordinarily*</u> own funds deposited into bank accounts—such as the funds deposited into the bank accounts in question here—meaning that it is their property. *See An,* 733 F. Supp. 3d at 92 ("*Shaw* thus does not stand for the proposition that a bank can never assert a property interest in the deposited funds against the depositor."). Accordingly, withdrawing or transmitting those funds out of those accounts as part of a scheme to defraud the banks is a deprivation of a property interest.

The defendant—ignoring that the scheme involved more than opening an account—argues that "merely" opening an account based on false statements is not sufficient to "allege deprivation of a traditional property interest" and argues that *Shaw* "sheds no light" on when funds are stolen or obtained from one's own bank account. (Def. Mot. at 17). Even assuming the defendant is correct about *Shaw* (he is not), the defendant fails to cite any controlling authority that opening a bank account at a bank using false representations does not implicate a bank's traditional property interests. Indeed, several courts in this Circuit have denied motions to dismiss indictments based on similar arguments that opening an account is not sufficient to allege a violation of 18 U.S.C. § 1344. *See An*, 733 F. Supp. 3d at 93-94 ("[E]ven if it were established at trial that all the relevant funds and accounts belonged to the [defendants], that would not necessarily require dismissal because the victim banks generally would have had ownership or at least possessory interest in deposited funds and presumably would have profited from the accounts."); *Motovich*, 2024 WL 2943960, at *4 (finding indictment sufficiently alleged bank fraud where defendant used materially

13

false representations to open bank accounts, deposited money into those accounts, and then explained how defendants used those funds); *Kwok*, 2024 WL 1407057, at *9 (finding indictment sufficiently alleged bank fraud where it tracked the language of the statute and alleged that false representations were made to a financial institution to "open and maintain accounts used in furtherance of their fraud and obtain funds under the custody and control of those financial institutions.").[4]

The defendant attempts to distinguish this case from *An*, *Motovich*, *Bankman-Fried*, and *Kwok* by looking to speaking allegations in the underlying indictments. But in those cases, as is the case here, the courts found that the indictments were sufficient because the statutory allegations tracked the language of the statute. *See Kwok*, 2024 WL 1407057, at *9 (finding bank fraud count "legally sufficient" where it "tracks the language of the statute"); *Bankman-Fried*, 680 F. Supp. 3d at 305 (finding bank fraud count states an offense where it "tracks the statutory language of Section 1344(2)"); *Motovich*, 2024 WL 2943960, at *4 (finding bank fraud counts state offenses where they "plainly track the language of the applicable underlying statute"); *An*, 733 F. Supp. 3d at 90 ("[T]he Indictment sufficiently alleges a bank fraud scheme under the minimal standards required at this stage."). Accordingly, the Indictment sufficiently states an offense because it, too, tracks the statutory language of 18 U.S.C. § 1344.

---

[4] In a footnote, the defendant argues that—despite the many misrepresentations he made to multiple banks—his transacting in cryptocurrency was not hidden from the banks because of a 2021 letter written to the Department of Justice and a 2019 Sale and Purchase Agreement for Vintech Capital. The defendant's arguments about how he was forthcoming about the nature of his business and transactions are matters more appropriately addressed by a jury and, in any event, are flatly contradicted by the recorded conversations he had with UC-1 where he explained on multiple occasions that he used satellite companies that were not involved with cryptocurrency to avoid banks closing his accounts. (Compl. ¶ 28).

The defendant cites an out-of-Circuit case from the Eastern District of Wisconsin as a "persuasive opinion" in support of his argument that alleging an account was opened based on a "mere misstatement" is not sufficient to allege bank fraud. (Def. Mot. at 24). But that case is easily distinguished. In *United States v. Braeger*, the defendant opened a business checking account at a bank in the name of a company purportedly formed to invest in an energy plant in Uganda. No. 21-CR-233, 2023 WL 2136722, at *1 (E.D. Wis. Feb. 21, 2023). The defendant then solicited investors with a memoranda that contained misrepresentations and received a $100,000 check as a result, which he deposited into his business account. *Id.* The indictment alleged that the defendant obtained money from the bank after he deposited the victim's funds into his bank account. *Id.* The court reasoned that the bank's involvement was "wholly fortuitous—a function of the victim's paying the fraudster by (valid) check rather than cash." *Id.* at *5. The court then dismissed the indictment after finding that setting up the business account did not induce the bank to later disburse funds, rather it was just a step in a plot to defraud investors. *Id.* at *7. Here, the banks' involvement was not fortuitous—rather, they were an integral part of the defendant's scheme to operate his unlicensed money remitting business, and the defendant was well aware that he had to lie to the banks regarding the nature of his business in order for them to process the transactions. Moreover, unlike in *Braeger*, the heart of the defendant's misrepresentations is to the banks themselves, so that he could obtain property in the bank's control—the defendant's misrepresentations are not to some third party whose funds then ended up in the defendant's bank accounts.

Accordingly, the Court should deny the defendant's motion to dismiss Count Three.

### 3.    Count Three Adequately Alleges False Statements

The defendant also contends that the defendant's statements to various financial institutions were not actually false because his businesses transacted in cryptocurrency, cryptocurrency

involves blockchain technology, and cryptocurrency wallets are software programs that interface with blockchains. (Def. Mot. at 26). While this is incorrect, it is also a factual argument that requires a consideration of the evidence and is therefore properly raised at trial, not through a motion to dismiss. Where the Government has not made a full proffer of the evidence it intends to introduce at trial—as is the case here—the Court should not look beyond the face of the indictment or draw inferences as to the proof that would be introduced by the Government at trial. *Alfonso*, 143 F.3d at 776-77 (2d Cir. 1998) (finding dismissal of indictment inappropriate where indictment tracked the language of the relevant statute and court looked beyond face of the indictment because "such an inquiry into the sufficiency of the evidence was premature" where Government had not made a full proffer of its evidence).

By encouraging the Court to make a factual determination at this stage, the defendant is effectively asking the Court to engage in summary judgement proceedings, which do not exist in federal criminal procedure. *See United States v. Aiyer,* 33 F.4th 97, 117 (2d Cir. 2022) "[S]ummary judgment does not exist in federal criminal procedure."); *United States v. Sampson*, 898 F.3d 270, 279 (2d Cir. 2018) ("Conspicuously absent from the Federal Rules of Criminal Procedure, however, is an analogue for summary judgment under Federal Rule of Civil Procedure 56."). The district court must give the Government an opportunity to "make a detailed presentation of the entirety of the evidence before a district court can dismiss an indictment on sufficiency grounds," and the district court lacks the authority "to require the government, before trial, to make such a presentation" as this "could effectively force a summary judgment-like motion on the government." *Sampson*, 898 F.3d at 282. Thus, courts have declined invitations to "evaluate the adequacy of the facts to satisfy the elements of the charged offense" because "that is something

[courts] do after trial." *Dawkins*, 999 F.3d at 780. The Court should do the same here and deny the defendant's motion to dismiss Count Three.

### C.    Counts Two and Four Sufficiently Allege Offenses

The defendant argues that Counts Two and Four should be dismissed because they were both predicated on the bank fraud that is the subject of Count Three. Because the Court should deny the defendant's motion to dismiss Count Three, the Court should also deny the defendant's motion to dismiss Counts Two and Four on this basis.

The defendant additionally argues that Counts Two and Four fail because those counts impermissibly merge with the predicate bank fraud offense. That argument is without merit. Count Three alleges that the defendant devised a scheme to open bank accounts at financial institutions based on false representations regarding the use of those accounts in order to operate an unlicensed money remitted business related to the operation of an over-the-counter cryptocurrency exchange. Count Two alleges that the defendant knowingly conducted financial transactions involving the proceeds of that bank fraud designed to conceal the nature, location, source, ownership, and control of the proceeds of the bank fraud (Indictment ¶ 3), and Count Four similarly charges that the defendant engaged in a $500,000 transaction, which consisted of proceeds of the bank fraud (Indictment ¶ 5).

As the Court knows, at this stage, the Court must take the allegations in the Indictment as true. *See Boyce Motor Lines*, 342 U.S. at 343 n. 16 ("This case is here to review the granting of a motion to dismiss the indictment. It should not be necessary to mention the familiar rule that, at this stage of the case, the allegations of the indictment must be taken as true."). Therefore, as alleged in the indictment, the conduct that forms the basis of the bank fraud charge (the false statements to open bank accounts to operate an unlicensed money remitting business) is thus distinct from the conduct that forms the basis of the money laundering charges (the transferring of

17

the bank fraud proceeds). *See United States v. Navarro*, 551 F. Supp. 3d 380, 388 (S.D.N.Y 2021) ("On a Rule 12(b) motion to dismiss an indictment, the Court accepts the allegations in the indictment as true and may not consider the sufficiency of the evidence.").

In any case, even if the Court were to look outside the four-corners of the Indictment, the defendant's argument is easily dismissed. At trial, the Government would expect the evidence to show, among other things, that the defendant sometimes transferred funds between bank accounts belonging to his Shell Companies before transferring the funds to a shell company in Colombia or another country. For example, between in or about July and October of 2020, VC Innovated wired approximately $3,975,000 across approximately 46 transfers from its account at Bank-1 to an account in the name of Softmill at Bank-1. Between in or about August and October 2020, Softmill wired approximately $5,106,256 across approximately 134 transfers to various companies in Colombia. As another example, between in or about July and October of 2020, VC Innovated wired approximately $7,161,000 from its account at Bank-1 across approximately 69 transfers to an account in the name of AZ Technologies at Bank-1. Between in or about August and October 2020, AZ Technologies wired approximately $8,146,771 across 133 transfers to several shell companies in Colombia. Of those wires, AZ Technologies wired approximately $3,732,536 to three shell companies owned, operated, or controlled by a cooperating witness ("CW-1"). Many of these wires included "invoice payment" in the description, and the Government expects that CW-1 would testify that CW-1's companies did not perform work for AZ Technologies. (*See* Compl. ¶ 23).

The above limited preview of some of the Government's evidence, showing layered transactions between the defendant's Shell Companies, makes clear that the conduct underlying the bank fraud (which involved opening accounts at various banks and then using those accounts to operate an unlicensed money remitting business related to a cryptocurrency exchange) is

separate from the conduct underlying the money laundering (which involved transfers to Colombia, among other countries). Accordingly, the Court should deny the defendant's motion to dismiss Counts Two and Four.

## **CONCLUSION**

For the foregoing reasons, the Government respectfully submits that the defendant's motion to dismiss should be denied in its entirety.

Dated:     New York, New York
           May 9, 2025

                             Respectfully submitted,

                             JAY CLAYTON
                             United States Attorney
                             Southern District of New York

By:     \_\_/s/_____
                             Jennifer N. Ong
                             Assistant United States Attorney
                             (212) 637-2224