**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*United States Attorney's Office*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*


April 16, 2026

**By ECF**
The Honorable Mary Kay Vyskocil
United States District Judge
Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, New York 10007

> Re: ***United States v. Maximilien de Hoop Cartier, et. al,***
> **S5 24 Cr. 133 (MKV)**

Dear Judge Vyskocil:

The Government respectfully submits this letter in advance of the sentencing of the defendant, Maximilien de Hoop Cartier, scheduled for April 23, 2026. The defendant pled guilty pursuant to a plea agreement to (i) operating an unlicensed money transmitting business from at least in or about 2018 through in or about February 2024, in violation of 18 U.S.C. § 1960, and (ii) conspiring to commit bank fraud from at least in or about 2018 through in or about February 2024, in violation of 18 U.S.C. § 371.

As described in more detail below, for approximately six years, the defendant ran an unlicensed money transmitting business that operated as an over-the-counter ("OTC") cryptocurrency exchange. The defendant's cryptocurrency exchange, and his web of shell companies, played a key role in a sophisticated international money laundering network that utilized the U.S. financial system to launder hundreds of millions of dollars in criminal proceeds through the United States to Colombia, among other countries. For the reasons further discussed below, the Government believes that a Guidelines sentence of 120 months' imprisonment would be sufficient, but not greater than necessary to satisfy the goals of sentencing.

## I.      Background

### A.  Offense Conduct

1.  Cartier's Cryptocurrency Exchange

The defendant operated an over-the-counter ("OTC") cryptocurrency exchange since at least 2018 until his arrest in this case. (PSR ¶¶ 12, 25). The defendant used his OTC cryptocurrency exchange to buy and sell cryptocurrency on behalf of his clients. In other words, the defendant

both (i) accepted fiat currency to his U.S.-based shell companies, which he then used to purchase cryptocurrency at an established cryptocurrency exchange for his clients; and (ii) accepted cryptocurrency, which he converted to fiat currency at an established cryptocurrency exchange and transferred to his clients using one of his shell companies. (*See* PSR ¶ 12).

The defendant's OTC cryptocurrency exchange was not a single company but rather a network of U.S.-based shell companies that the defendant operated and controlled for the sole purpose of converting cryptocurrency into usable fiat currency. (PSR ¶¶ 12, 26). Specifically, the defendant registered, controlled, and/or operated the following shell companies, which he actively utilized in connection with his cryptocurrency exchange:

- Vintech Capital LLC ("Vintech Capital"). Vintech Capital was incorporated in July 2018 in the defendant's name. According to documents submitted to the Internal Revenue Service ("IRS"), Vintech Capital purported to provide services in the financial sector.

- VC Innovated Technologies LLC ("VC Innovated"). VC Innovated was incorporated in September 2019 in the defendant's name. According to documents submitted to the IRS, VC Innovated purported to provide the following services: "Blockchain Technology, AI [artificial intelligence], and VR [virtual reality]."

- AZ Technologies LLC ("AZ Technologies"). AZ Technologies was incorporated on or about January 14, 2020 in the name of a 22-year-old who considered the defendant to be his "uncle" ("Individual-1"). According to documents submitted to the IRS, AZ Technologies purported to provide the following services: "Software, Hardware, AI, and Blockchain Technology."

- Softmill LLC ("Softmill"). Softmill was also incorporated on or about January 14, 2020 in Individual-1's name. According to documents submitted to the IRS, Softmill—like AZ Technologies—purported to provide the following services: "Software, Hardware, AI, and Blockchain Technologie [sic]."

- Sun Technologies LLC ("Sun Technologies"). Sun Technologies was incorporated in November 2020 in the name of another individual ("Individual-2"). According to documents submitted to the IRS, Sun Technologies purported to provide the following service: "Digital Technology Solution."

- Bullpix Solutions LLC ("Bullpix"). Bullpix was also incorporated in November 2020 in the name of Individual-2. Individual-2 did not actually participate in the operation of Sun Technologies or Bullpix despite being listed on those companies and accounts.[1]

---

[1] CW-1's Colombian shell companies worked with Sun Technologies and Bullpix. Nevertheless, CW-1 would testify that CW-1 never spoke to Individual-2. In addition, like Individual-1's signature, Individual-2's signature appears to be nearly identical across multiple fake technology services contracts for Sun Technologies and Bullpix.

According to documents submitted to the IRS, Bullpix purported to provide the following services: "Digital advertising, IT platform, Software."

(PSR ¶¶ 16, 26).

In addition to the above shell companies, which the defendant primarily used to operate his OTC cryptocurrency exchange, the defendant also registered other shell companies in the United States, including shell companies in the names of others: (i) Vortex One LLC, (ii) OCP Development Systems LLC, (iii) Fastone Consulting International LLC, (iv) Datahouse LLC, and (v) Digitool LLC. *See, e.g.*, USAO_REL_0000050134, USAO_REL_0000004542. Aside from Vintech Capital, which purported to provide services in the financial sector, the defendant's shell companies (collectively, the "Cartier Shell Companies") purported to be in the software or technology industry rather than the cryptocurrency or financial sector.

The defendant was knowledgeable about the laws and regulations applicable to money service businesses ("MSBs"), like his OTC cryptocurrency exchange, and that it was important to establish an anti-money laundering ("AML") program, but he willfully failed to do so. Among other things, MSBs are required to comply with the Bank Secrecy Act ("BSA"), designate a BSA officer, establish and maintain an effective AML program, report suspicious activity and certain transactions that are more than $10,000, and retain certain records. *See* Financial Crimes Enforcement Network, BSA Requirements for MSBs (last accessed on April 11, 2026), available at https://www.fincen.gov/bsa-requirements-msbs. While the defendant completed the ministerial act of registering Vintech Capital and VC Innovated as an MSB with the Financial Crimes Enforcement Network ("FinCEN") in 2019, the defendant failed to renew the MSB registrations for Vintech Capital and VC Innovated every two years as required by law. (PSR ¶ 26 n.6). In addition, the defendant failed to register any of his other companies as MSBs despite advice from outside compliance consultants that he needed to follow federal and state laws and regulations in operating these companies, including BSA and know-your-customer ("KYC") regulations, and that he also needed to obtain licenses for these companies with state regulators.[2] (PSR ¶¶ 12, 26 n.6). These consultants advised the defendant not to conduct his cryptocurrency exchange, because, among other things, the defendant was doing business with Colombian customers (which was a high-risk country known for money laundering), these consultants understood that the defendant was not conducting due diligence on his customers, the defendant did not know who his customers were, and he had failed to implement the AML program and procedures developed by consultants.

---

[2] The defendant failed to pay his first consultant for all of its services, and used the company's branding on the defendant's website to suggest the legitimacy of the business, without the company's permission.

2. <u>Cartier Used the Identity of a 22-Year Old to Create and Open Bank Accounts for Certain of His Shell Companies</u>

As set forth above, the defendant registered two of his shell companies, AZ Technologies and Softmill, in the name of Individual-1.[3] The defendant convinced Individual-1 to open AZ Technologies and Softmill in Individual-1's name after offering to pay $1,000 a month to Individual-1. Individual-1 agreed and, on or about January 13, 2020 (*i.e.*, the day before AZ Technologies and Softmill were incorporated), Individual-1, at the defendant's request, emailed the defendant a sheet of paper that Individual-1 had signed multiple times. *See* USAO_0000107354.

In or about February 2020, the defendant paid for Individual-1, who lived in Argentina, to fly to New York to meet the defendant to open bank accounts for AZ Technologies and Softmill. (PSR ¶ 16). During this brief trip, the defendant wined and dined Individual-1, got him a room at the Plaza Hotel, and provided him entertainment. Shortly after that trip, in or about early March 2020, after Individual-1 had returned to Argentina, Individual-1 became concerned about what the defendant was going to do with those bank accounts, and Individual-1 told the defendant to remove his name from the companies and banks accounts. (*Id.*) In response, the defendant falsely represented to Individual-1 that he would remove Individual-1 from these companies and sent documents to Individual-1 that purportedly showed that Individual-1 had been removed from AZ Technologies and Softmill. (*Id.*) Those documents have been attached here as Exhibit A. Nevertheless, the defendant continued to use Individual-1's name on the bank accounts for AZ Technologies and Softmill, he continued to sign Individual-1's name to contracts without his permission using the signatures that he previously obtained from Individual-1, and he continued to use Individual-1's name as being connected to the company in materials he submitted to banks and the government in or about 2021, after the DEA seized certain of the defendant's bank accounts, as further described below. (*Id.*) Attached as Exhibit B are examples of contracts involving AZ Technologies and Softmill from after March 2020—*i.e.*, after Individual-1 was supposedly removed from the companies—where the defendant used Individual-1's name or signature without his permission.

3. <u>The Bank Fraud Scheme</u>

To operate his OTC cryptocurrency exchange, the defendant also systematically opened accounts for the Cartier Shell Companies at multiple U.S. banks. The defendant repeatedly lied to these U.S. banks, including by (i) falsely representing to the banks that the accounts would be used by businesses in the software publishing or software development industry even though the defendant knew the accounts would be used to receive and transmit funds on behalf of third parties; (ii) falsely representing to the banks that the accounts would not be used to operate an MSB related to the operation of an OTC cryptocurrency exchange; (iii) submitting fake documents to the banks regarding the operations of the Cartier Shell Companies; and (iv) making false representations and

---

[3] While Individual-1 was listed as the sole member of the companies, the defendant otherwise listed himself in the registration paperwork as the contact for billing, communications, and mail forwarding purposes. (PSR ¶ 26(iii), (iv))

omitting material facts regarding the nature and purpose of transactions being conducted. (PSR ¶¶ 15, 27-28). For example:

*Vintech Capital*. Between in or about August 2018 and July 2022, the defendant opened and operated accounts with at least three different U.S. banks for Vintech Capital. For example, in August 2018, the defendant opened an account for Vintech Capital at Bank-1. In opening this account, the defendant falsely stated that Vintech Capital was in the "Software Publishers" business and provided storage on servers for businesses. (PSR ¶ 27(i)). The defendant also falsely stated that Vintech Capital's customers were primarily located in the United States and Monaco. In or about February 2021, Bank-1 closed Vintech Capital's account after identifying that the defendant owned Vintech Capital and Bank-1 previously terminated its relationship with the defendant "due to unresolved operational risk." *See* USAO_0000058890. Specifically, the defendant "was the subject of an AML event filings reporting unresolved transaction risk related to incoming and outgoing wires and ACH debits which moved through multiple accounts and ultimately deposited into multiple accounts largely residing in Colombia, giving the appearance of layering." *See id.*

*VC Innovated.* Between in or about October 2019 and May 2023, the defendant opened and operated accounts with at least five different U.S. banks for VC Innovated. For example, in October 2019, the defendant opened an account for VC Innovated at Bank-1. (PSR ¶ 27(ii)). In opening VC Innovated's account at Bank-1, the defendant falsely stated, among other things, that (i) VC Innovated was in the "Software Publishers" business and, more specifically, worked in "App development and fin technology"; and (ii) that VC Innovated customers were primarily located in the United States. *See* USAO_0000058828, USAO_0000058847. Bank-1 closed VC Innovated's account in October 2020, citing "unresolved operational risk" and noting that the account had been identified "as having wire activity to the Medellin area in Colombia which is a high risk area." *See* USAO_0000058891.

As another example, between in or about January and August 2020, the defendant maintained an account for VC Innovated at another U.S. bank ("Bank-2"). In opening this account, the defendant falsely stated, among other things, that (i) only 10% of its operations were international; (ii) VC Innovated was in the business of "Software Publishers"; and (iii) that VC Innovated had operation sales in only Hong Kong, Monaco, the United Kingdom, and France. *See* USAO_0000037759-USAO_0000047761. On May 6, 2020, a Bank-2 representative asked the defendant to identify the companies that VC Innovated worked with (i) in the United States, and (ii) in Colombia, including the services provided by the Colombian companies. In response to that email, the defendant falsely stated that VC Innovated operated "by managing/outsourcing engineers to create advanced software and online platforms for companies around the world" and that the engineers were from technology companies in Colombia. Among other companies, the defendant identified Big Data Technology SAS ("Big Data") (controlled by co-defendant Felipe Estrada Echeverry) and another Colombian company operated by a cooperating witness ("CW-1"). The defendant also falsely represented that Big Data and CW-1 provided services, which they did not actually provide such as "Big Data" or "API development." Moreover, the defendant falsely stated that VC Innovated worked with Google, Facebook, and Microsoft. *See* USAO_REL_0000234766 to USAO_REL_00002347669; USAO_REL_0000234417 to USAO_REL_0000234420.

***AZ Technologies***. Between in or about February 2020 and April 2021, the defendant opened and operated accounts with at least three different U.S. banks for AZ Technologies. For example, in early February 2020, the defendant paid for an international flight for Individual-1 so that they could open bank accounts for AZ Technologies and Softmill. (PSR ¶ 16). Specifically, on or about February 3, 2020, the defendant and Individual-1 opened an account for AZ Technologies at Bank-1. (PSR ¶ 27(iii)). The defendant falsely represented, among other things, that (i) AZ Technologies was in the "Software Publishers" business, specifically "Technology," and (ii) the United States was the country where AZ Technologies had significant operations and customers. *See* USAO_0000057433, USAO_0000057437, USAO_0000057453. Individual-1 was listed as having 100% ownership while the defendant was listed as an authorized signer. Bank-1 closed AZ Technologies's account in or about October 2020.

In addition, between in or about March and August 2020, the defendant opened and operated an account for AZ Technologies at Bank-2. In or about mid-February 2020, the defendant and Individual-1 applied to open this account. In opening this account, the defendant falsely represented that AZ Technologies was in the business of "Data Processing, Hosting, and Related Services" and that only 10% of its operations were international. *See* USAO_0000038213. Moreover, the defendant only listed Monaco, the United Kingdom, France, Hong Kong, and Australia as the countries where AZ Technologies operated. *See* USAO_000038216.

***Softmill***. Between in or about February 2020 and April 2021, the defendant opened and operated accounts with at least three different U.S. banks for Softmill—the same banks used to open accounts for AZ Technologies. For example, between in or about February and October 2020, the defendant opened and operated an account at Bank-1 for Softmill. The defendant opened that account, along with Individual-1, on or about February 3, 2020—*i.e.*, the same day they opened an account for AZ Technologies. *See* USAO_0000036380.

In addition, between in or about March and August 2020, the defendant opened and operated an account for Softmill at Bank-2. (PSR ¶ 27(iv)). In or about mid-February 2020, the defendant and Individual-1 applied to open this account. In opening this account, the defendant falsely represented that Softmill was in the business of "Data Processing, Hosting, and Related Services" and that only 10% of its operations were international. *See* USAO_ 0000038271. Moreover, the defendant only listed Monaco, the United Kingdom, France, Hong Kong, and Australia as the countries where Softmill operated. *See* USAO_ 0000038274.

***Sun Technologies.*** Between in or about March 2021 and February 2023, the defendant opened and operated accounts with at least two different U.S. banks for Sun Technologies. For example, on November 23, 2021, the defendant and Individual-2 opened an account for Sun Technologies at a U.S. bank ("Bank-3"). (PSR ¶ 27(v)). In opening that account, the defendant falsely stated that Sun Technologies was a "Software Dev Company" in the services business. As another example, in or about March 2021, the defendant and Individual-2 opened an account at another U.S. bank ("Bank-4"). In opening the account, the defendant falsely reported that Sun Technologies was a "Professional Services Firm[]" *See* USAO_ 0000009043. Bank-4 closed that account in or about May 2021. *See* USAO_0000009039 to USAO_000009060.

Page 7

***Bullpix***. Between in or about November 2021 and his arrest in February 2024, the defendant opened and operated accounts with at least two different U.S. banks for Bullpix. For example, the defendant and Individual-2 opened an account for Bullpix in November 2021 at another U.S. bank ("Bank-5"). (PSR ¶ 27(vi)). In opening this account, the defendant falsely stated that Bullpix was in the "Professional, Scientific, and Technical Services" industry and that Bullpix was in the business of "software development and implantation." *See* USAO_0000042672. The defendant also listed Individual-2 as a signor on the account. In addition, in opening the account, the defendant completed a form titled "Enhanced Due Diligence Customer Activity Screening." *See* USAO_0000045203. In completing this form, the defendant falsely stated, among other things, that his company did not accept funds, currency, or virtual currency from customers or send/transit the funds, currency, or virtual currency to another person or location. In answering the questions in this manner, the defendant avoided being subjected to additional due diligence.

In or about January 2023, the defendant provided fraudulent bank statements to Bank-5 in an effort to "optimize" Bullpix's account. Specifically, Bank-5 representatives requested bank statements from the defendant to consider whether to optimize the Bullpix account. Optimizing the account would, among other things, result in a lower fee for incoming wires and allow a certain number of outgoing wires for no fee. In response to this request, the defendant provided statements from Bank-3 that were purportedly for VC Innovated's account ending in 6623 (the "6623 Account"). However, VC Innovated did not have an account at Bank-3 and the 6623 Account was actually in the name of Sun Technologies. Below is a side-by-side comparison of one of the fraudulent VC Innovated statements that the defendant sent to Bank-5 (on the left) and the real Sun Technologies statement from Bank-3 (on the right) with the names and account numbers highlighted:



*Compare* USAO_0000045107 to USAO_0000045124 *with* USAO_0000005160 to USAO_000005177. Based at least in part on these fraudulent documents, Bank-5 optimized the Bullpix account in or about February 2023.

\* \* \*

The defendant understood that he needed to lie to U.S. banks to keep his accounts—and therefore his OTC cryptocurrency exchange—operational.

In or about October 2023, CW-1, at the direction of law enforcement, introduced an undercover law enforcement officer ("UC-1") to the defendant. CW-1 explained to the defendant that UC-1 worked for someone else who had a large amount of USDT that needed to be transferred to banks in New York. (PSR ¶ 56). During a recorded call with CW-1 and UC-1, the defendant offered to liquidate the USDT for UC-1. In addition, the defendant explained, among other things, that he preferred to do multiple smaller transactions in one day rather than one large transaction to avoid "complications." The defendant told UC-1 that he previously transferred approximately $22 million for a New York company in $500,000 increments. (PSR ¶ 57). The defendant further explained that his cryptocurrency company would not pay UC-1; rather, the payments would come from a satellite company that is not in the cryptocurrency business—*i.e.* one of the Cartier Shell Companies. (PSR ¶¶ 57, 59, 60). The defendant explained that he used satellite companies because banks tended to deny transfers or close accounts when the banks learn that the transfers are from accounts at crypto-friendly banks. (PSR ¶ 58).

In another recorded call with UC-1 in December 2023, the defendant again explained that his companies "basically do cryptocurrency" and that the defendant hid this fact from banks to avoid his accounts being closed. (PSR ¶ 61). Furthermore, the defendant told UC-1 that Bullpix was a technology company, which is what he needed to say to operate an account at a traditional bank. (PSR ¶ 61). The defendant, again, explained that, to avoid issues with banks, he created a new company to do business to avoid issues and conceal the source of the fiat currency. (PSR ¶ 61).

### 4. Cartier's Role with the Money Laundering Network

#### a. Overview of the Network

Since at least in or about 2019, the defendant and his OTC cryptocurrency exchange have played a key role in an international money laundering network (the "Network") that operated in the United States and Colombia, among other countries, to launder hundreds of millions of dollars (representing the proceeds of illicit activity, including drug trafficking) through the U.S. financial system to Colombia, among other countries. (PSR ¶¶ 26, 29, 31, 47, 63).

The Network was sophisticated, and members had different roles to facilitate each step of the laundering process. (PSR ¶ 32). Specifically, the Network had the following positions and operated as follows: Main Providers or their partners converted illicit proceeds (such as from drug trafficking or fraud) that were located outside of Colombia (such as in the United States or Mexico) to USDT (referred to as Tether), a cryptocurrency stablecoin pegged to the United States dollar. (PSR ¶ 32(i)). Main Providers, or their partners, were typically able to purchase the USDT below market value (*i.e.*, at the largest discount or most favorable exchange rate) because the funds had closer ties to the underlying criminal activity. (PSR ¶ 32(i)). Main Providers worked with Providers to send the USDT to a Facilitator. (PSR ¶ 32(ii)). The Facilitator sent the USDT to a U.S. Client—like the defendant—who acted as an OTC cryptocurrency exchange and converted the USDT back to fiat currency. (PSR ¶ 32(ii)). U.S. Clients then wired the fiat currency (less a commission) to

shell companies in Colombia that were managed by Colombian Clients. These wires were often sent pursuant to fake technology services contracts that were used to justify the wires to Colombian banks. (PSR ¶ 32(iii)). Colombian Clients then used their Colombian shell companies to transfer money to other Colombian shell companies for the funds to eventually be withdrawn and delivered to Main Providers or their associates. (PSR ¶ 32(iv)).

The defendant worked as a U.S. Client in the Network: He received USDT from Main Providers/Providers (through Facilitators), which he then converted using his accounts at multiple cryptocurrency exchanges and the Cartier Shell Companies. The defendant then wired the money from the Cartier Shell Companies to the shell companies of Colombian Clients. At times, the defendant wired the money between the Cartier Shell Companies before wiring the funds to Colombia. For example, between in or about July and October of 2020, VC Innovated wired approximately $7,161,000 across approximately 69 transfers to AZ Technologies. Within that same time period, between in or about August and October 2020, AZ Technologies wired approximately $8,146,771 across 133 transfers to multiple shell companies in Colombia. Of those wires, AZ Technologies wired approximately $3,732,536 to three shell companies owned, operated, or controlled by CW-1. Many of these wires included "invoice payment" in the description even though CW-1 never performed any work for the defendant or the defendant's shell companies. (PSR ¶ 47).

The defendant was critical to the Network's success in laundering the proceeds back to Colombia and other countries because he (i) converted the USDT (representing the proceeds of criminal activity) to usable fiat currency; and (ii) helped the funds appear to be legitimate by transferring the fiat currency pursuant to fake technology services contracts. (*See* PSR ¶¶ 47-48).

In total, the defendant personally helped launder approximately $472 million dollars in the though his shell companies. (*See* PSR ¶¶ 36, 47, 63).

b.    The Defendant's Work with the Zuluaga Cell

There are different cells within the Network that are composed of certain Main Providers, Providers, Facilitators, U.S. Clients, and Colombian Clients that repeatedly work with each other to launder illicit proceeds through the Network, a process that was referred to as "monetization" or "OTC" by some of the conspirators. Between at least in or about May 2023 and in or about November 2023, the defendant worked as a U.S. Client in a cell (the "Zuluaga Cell") with, among others: co-defendant Leonardo de Jesus Zuluaga Duque as a Main Provider; co-defendant Erica Milena Lopez Ortiz as a Provider; co-defendant Estrada and another co-conspirator ("CC-1"), who worked as Colombian Clients; and CW-1 as a Facilitator. (PSR ¶¶ 36-45, 48, 49).

Prior to laundering with the Zuluaga Cell, the defendant used Bullpix to enter into fake technology services contracts with three shell companies operated or controlled by Estrada. (PSR ¶ 43). These contracts were nearly identical to one another except for the names of the parties, the companies, and the signatures. (PSR ¶ 44). In addition, the defendant also used Bullpix and Sun Technologies to enter into fake technology services contracts with CC-1's Colombia-based shell companies. (PSR ¶ 43). As with the other contracts, these fake contracts were nearly identical to one another with a few minor exceptions. In addition, the contracts had a payment schedule which

did not align with the millions of dollars that Bullpix transferred to CC-1's shell company between May and November 2023. (PSR ¶ 45).

Over the course of approximately six months in 2023, the defendant worked with the Zuluaga Cell approximately 62 times to launder a total of approximately $14.5 million U.S. dollars through the Network. (PSR ¶ 36). At least some of the money that was laundered by the Zuluaga Cell were the proceeds of drug trafficking. For example, on or about September 15, 2023, Zuluaga, Lopez, CW-1, and Zuluaga's son ("CC-2") met for lunch in Medellin, Colombia. (PSR ¶ 51). During that meeting, among other things, Zuluaga and CC-2 explained that Zuluaga does not "bring the drugs, sell the drugs, and collect the money . . . to buy Tether." (PSR ¶ 51(ii)). Rather, as Zuluaga explained, there are people who do that and Zuluaga buys from them. (PSR ¶ 51(ii)). As another example, on or about November 29, 2023, CW-1 and other law enforcement confidential sources purchased approximately 9 kilograms of cocaine base from co-defendants Alexander Areiza Ceballos and Adrian Areiza Ceballos in Medellin, Colombia. (PSR ¶¶ 54-55). Zuluaga and Lopez directed payment for these drugs to a particular cryptocurrency address, which Zuluaga and Lopez had previously used to send USDT to the defendant to launder through the Zuluaga Cell on approximately six different occasions. (PSR ¶ 54).

c.  The DEA Seizure

In April 2021, agents with Drug Enforcement Administration ("DEA") seized accounts for VC Innovated, Softmill, and AZ Technologies at Bank-4 because those companies had received approximately $937,000 in drug trafficking proceeds from an undercover DEA account. (PSR ¶¶ 14, 50). Following that seizure, on or about December 1, 2021, the defendant and his counsel met with DEA agents and prosecutors with the U.S. Attorney's Office for the Eastern District Of Pennsylvania in an effort to get law enforcement to return the seized funds.[4] (PSR ¶ 14). In substance and in part, the defendant described his cryptocurrency business and told investigators that he was well known in the cryptocurrency industry and generated most of his clients through referrals. The defendant additionally admitted that he told banks he was in the business of technology software services—instead of stating that he operated as a cryptocurrency exchange—and also conceded that he was operating an unlicensed money remitter. However, he tried to minimize his conduct, he falsely represented his KYC process, that he was in the process of applying for his license to operate as a money remitter in several states, and that he had not opened another bank account following the seizure, and he made misrepresentations about the implementation of certain required compliance policies and practices.[5]

To further support his claim that the seized funds should be returned, the defendant also prepared and produced, among other things, back-dated master purchase agreements for some of his customers. (PSR ¶ 14). For example, the defendant provided a Master Purchase Agreement

---

[4] A copy of the DEA report of this meeting is attached here as Exhibit C.

[5] As explained above, the defendant opened a bank account for Sun Technologies at Bank-3 on November 23, 2021, and he opened a bank account for Bullpix at Bank-5 on November 24, 2021—approximately one week before this meeting with the DEA and federal prosecutors. *See* USAO_0000052999, USAO_0000042675.

between VC Innovated and one of CW-1's companies ("Company-1") that was dated February 6, 2020. That agreement, which is attached here as Exhibit D, contains what appears to be CW-1's signature; however, CW-1 never signed the document, and the metadata shows that the defendant filled out the document, including adding CW-1's signature, on September 25, 2021. Moreover, Company-1 and VC Innovated actually started working together in January 2020, and they entered into a contract (albeit a fake technology services contract) on January 13, 2020, which is attached here as Exhibit E. (PSR ¶ 46).

As a result of the defendant's efforts to mislead the DEA and evade scrutiny in that investigation, he was able to obtain the return of a substantial portion of the seized money from his accounts. (PSR ¶ 14). Some of the money that was seized was connected to the Zuluaga Cell, and led to a debt that Estrada incurred to Zuluaga.

> d. Cartier's Continued Money Transfers to Colombia after the DEA Seizure

Following the DEA's seizure of his accounts in April 2021, contrary to the defendant's assertion in his sentencing submission (Def. Mem. 17), the defendant continued to launder money with the Network. Specifically, the defendant continued to wire U.S. dollars to Colombian shell companies that were controlled by Colombian Clients, including with members of the Network that were not facilitated by CW-1 and were outside of the Zuluaga Cell. For example, in just January and February 2024, the defendant used Bullpix to send millions of dollars across approximately 80 transfers to two shell companies in Colombia that were controlled by another member of the Network. *See* USAO_ 0000106633 to USAO_0000107127.[6]

## B. The Charges and the Defendant's Plea

On February 20, 2024, a sealed five-count criminal complaint was filed in the Southern District of New York charging the defendant with (i) conspiracy to commit money laundering; (ii) money laundering; (iii) bank fraud; (iv) operation of an unlicensed money transmitting business; and (v) engaging in a monetary transaction in property derived from specified unlawful activity. (Dkt. No. 1). The defendant was arrested on February 22, 2024, in Miami, Florida.

On March 7, 2024, a grand jury returned a sealed six-count superseding indictment (the "S2 Indictment") charging the defendant and five others with various crimes including, as relevant to the defendant: (i) conspiracy to commit money laundering from at least in or about May 2023 to at least in or about November 2023; (ii) money laundering since at least in or about January 2020; (iii) bank fraud since at least in or about January 2020; (iv) engaging in a monetary transaction in property derived from specified unlawful activity on or about August 22, 2023; and (v) operation of an unlicensed money transmitting business since at least in or about January 2020. (Dkt. No. 16 (the "S2 Indictment")).

On May 22, 2024, the defendant made his initial appearance in this District.

---

[6] A sample of these transactions is attached as Exhibit F.

On July 28, 2025, the grand jury returned the S4 Indictment charging the defendant in five counts: conspiracy to commit money laundering with narcotics trafficking as the specified unlawful activity; money laundering with narcotics trafficking as the specified unlawful activity; money laundering with bank fraud as the specified unlawful activity; bank fraud; and operating an unlicensed money remitting business. (Dkt. No. 125, ("S4 Indictment")).

On October 23, 2025, the defendant waived indictment and pled guilty, pursuant to a written plea agreement, to a two-count superseding S5 felony information charging the defendant with (i) operating an unlicensed money remitting business between in or about 2018 through February 2024; and (ii) conspiracy to commit bank fraud, between in or about 2018 through February 2024. The defendant admitted in his plea allocution that he "used his companies to operate a money-transmitting business related to operations of a cryptocurrency exchange," he failed to obtain any money transmitting license from any state in which such license was required, he "did not disclose this information to the banks," and he knew what he did was wrong. (Plea Tr. 41-50).

## C.  The Applicable Guidelines Range

The Probation Office calculates the defendant's advisory Guidelines range as follows, which matches the parties' calculation of the Guidelines in the plea agreement and with which the Government agrees. The defendant has a total offense level of 31 as a result:

- A base offense level of 34 because the offense involved more than $250,000,000 but not more than $550,000,000 in transactions, pursuant to U.S.S.G. §§ 2S1.1(a)(2) and 2B1.1(b)(1)(O);

- Two levels were added because the defendant knew or believed that the funds involved in the offense were proceeds of unlawful activity, to wit, drug trafficking, pursuant to U.S.S.G. § 2S1.3(b)(1)(A);

- Two levels were subtracted because the defendant met the criteria for an adjustment for a zero-point offender, pursuant to U.S.S.G. § 4C1.1; and

- Three levels were subtracted for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1.

The defendant has zero criminal history points and therefore is in Criminal History Category I. Based on these calculations, the Guidelines range is 108 to 135 months' imprisonment. (PSR ¶¶ 72-88, 120). However, the statutorily authorized maximum sentence of 10 years is less than the maximum of the applicable guideline range; therefore, the applicable Guidelines range is 108 to 120 months' imprisonment. U.S.S.G. §5G1.2(b).

## D.  The Probation Office's Recommendation

The Probation Office recommended a significant but below Guidelines sentence of 96 months' imprisonment. (PSR at 37). In making this recommendation, the Probation Office

considered all of the factors set forth 18 U.S.C. § 3553(a), including the nature and circumstances of his offense, the defendant's background, and the objectives of punishment, deterrence, and promotion of respect for the law. (PSR at 38). In support of its recommendation, the Probation Office noted that "a significant term of imprisonment is warranted" because it could not "understate the seriousness of the offense, particularly the repeated, complex, and long term nature of Cartier's behavior." (PSR at 38). Moreover, the Probation Office reasoned that "[t]he defendant's actions served to facilitate the illicit laundering of a significant sum of money, with his knowledge that the funds included proceeds from illicit activity. In addition, it appears that his primary source of income from 2018 until his arrest was in the cryptocurrency business, directly related to the instant offense." (PSR at 38).

## II.    Discussion

### A.  Applicable Law

The Sentencing Guidelines continue to provide important guidance to sentencing courts following *United States v. Booker*, 543 U.S. 220 (2005), and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005).  Though they are advisory and not mandatory, the Sentencing Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions." *Gall v. United States*, 552 U.S. 38, 46 (2007).  It follows that district courts should treat the Sentencing Guidelines as the "starting point and the initial benchmark" in sentencing proceedings.  *Id.* at 49; *see also Booker*, 543 U.S. at 264 (explaining that district courts must "consult" the Sentencing Guidelines and "take them into account" when sentencing).  Accordingly, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *Gall*, 552 U.S. at 49.

After that calculation, a sentencing judge must consider seven factors outlined in Title 18, United States Code, Section 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) the four legitimate purposes of sentencing, as set forth below; (3) "the kinds of sentences available"; (4) the Guidelines range itself; (5) any relevant policy statement by the Sentencing Commission; (6) "the need to avoid unwarranted sentence disparities among defendants"; and (7) "the need to provide restitution to any victims," 18 U.S.C. § 3553(a)(l)-(7).  See Gall, 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant;
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

### B. A Guidelines Sentence of 120 Months' Imprisonment Is Appropriate in This Case

The factors set forth in 18 U.S.C. § 3553(a) strongly weigh in favor of a term of imprisonment of 120 months, which is consistent with the Guidelines.

### 1. The Seriousness of the Offense and Need for Just Punishment

A substantial sentence of imprisonment is necessary to reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense. 18 U.S.C. § 3553(a)(2)(A). The defendant's crimes took course over multiple years and involved hundreds of millions of dollars in both fraud and money laundering activity. For at least six years, the defendant systematically opened and operated a network of shell companies—*i.e.*, the Cartier Shell Companies—and bank accounts in the United States to function as an OTC cryptocurrency exchange, which he then knowingly used to launder narcotics trafficking proceeds. With the exception of Vintech Capital, from their inception, the defendant lied about the true nature of the Cartier Shell Companies by falsely stating in IRS documents that the companies were in the business of software or technology. In other words, the sole purpose of the Cartier Shell Companies was to operate the defendant's illicit and unregistered cryptocurrency exchange—they had no other legitimate purpose. To further obfuscate the true dealings of the Cartier Shell Companies, the defendant also used others (like Individual-1 and Individual-2) to be the nominal owners of some of the shell companies. The defendant did so to move even more money through his shell companies. In fact, the defendant continued to use Individual-1's name and signature even after he asked to be removed from AZ Technologies and Softmill. He also did the same with Individual-2, who did not actually participate in the operation of Sun Technologies or Bullpix despite being listed on those companies and accounts.[7]

The defendant also failed to comply with the BSA and failed to obtain and maintain licenses for the Cartier Shell Companies to operate as MSBs. The defendant knew that he needed to obtain a license because he did so for Vintech Capital and VC Innovated; nevertheless, he failed to maintain those licenses and failed to obtain licenses for the other Cartier Shell Companies. The defendant continued to ignore the licensing requirements for MSBs even after the DEA seized nearly $1 million from accounts for VC Innovated, AZ Technologies, and Softmill.  Licensing requirements for MSBs facilitates the legal and regulated activities of money transmitters and, among other things, ensures that MSBs are adhering to anti-money laundering standards. The defendant, however, ignored these requirements, failed to implement an effective AML program,

---

[7] CW-1's Colombian shell companies worked with Sun Technologies and Bullpix. Nevertheless, CW-1 would testify that CW-1 never spoke to Individual-2. In addition, like Individual-1's signature, Individual-2's signature appears to be nearly identical across multiple fake technology services contracts for Sun Technologies and Bullpix.

and, instead, made his services available to drug traffickers and others involved in criminal activity.

In addition, the defendant participated in a widespread scheme to defraud banks by repeatedly lying about the true nature of the Cartier Shell Companies. Although none of the defrauded banks have reported losing money, that was at least in part because the compliance programs of the relevant banks repeatedly identified the defendant's problematic conduct and closed his accounts. Even absent any direct losses, the defendant's scheme and others like it are enormously costly for such banks, which must expend significant financial resources on compliance programs to protect the financial system and detect criminal actors. Indeed, even with such compliance programs in place, the defendant moved approximately $472 million through the U.S. financial system.

The defendant defrauded U.S. banks and failed to implement AML programs or comply with licensing requirements so, at least in large part, his OTC cryptocurrency exchange could launder hundreds of millions in criminal proceeds for the Network.[8] The defendant's willingness to do so was particularly valuable to drug trafficking operations and other criminal organizations. That is because cryptocurrency is often used to move, layer, and obscure the trail of illicit funds, which the Network did by passing the dirty USDT through Main Providers, Providers, Facilitators, U.S. Clients, and Colombian Clients. However, because the majority of the global economy operates in cash or traditional bank transfers, it is important that the USDT is converted back into fiat currency. That is where the defendant and his OTC cryptocurrency came in. By converting the USDT into fiat currency and introducing that cash into the legal financial system the defendant helped make the funds appear to come from legitimate sources—a necessary step in the laundering process. The defendant also profited significantly from his Network activities; indeed, his only apparent motivation for engaging in the offenses is greed. The defendant's suggestion that "at worst, he turned a blind eye to the possibility that the cryptocurrency he transacted in was tied to some illegal activity," (Def. Mem. (Dkt. 226) 23), is belied by the defendant's agreement that a two-point enhancement applies because he "knew or believed that the funds were proceeds of unlawful activity," the uncontested evidenced described in detail in the PSR, and common sense.

The breadth of the defendant's misconduct is also serious and aggravating: the defendant was engaged in this conduct for almost six years. The defendant began operating his business even though an outside consultant advised him he needed to comply with the laws governing registration, licensing, and AML first, and then he continued to operate his OTC cryptocurrency exchange even after nearly $1 million was seized by the DEA. While most of those seized funds were returned to the defendant, that was only after the defendant lied and submitted fraudulent documents to federal agents and prosecutors. In any event, the incident did not prompt the defendant to take licensing or AML requirements more seriously. Rather, the defendant continued to operate without a license, he continued to lie to open and operate bank accounts, and he continued to launder hundreds of millions of dollars in USDT into fiat currency for criminal

---

[8] The defendant appears to claim he had a legitimate business and that not all of the funds he moved were from illicit activity. Even assuming that is true, that is also by design. Launderers often comingle funds from illicit activities with funds from illicit activity to obscure the origins of the illicit proceeds.

organizations. The defendant's suggestion that he no longer continued to deal with Colombian clients unconnected with CW-1 after the DEA seizure is belied by the facts and the records described above. The extensive pervasiveness of misconduct and the sums of money involved further demonstrate the seriousness of his crimes.

The sophistication of the offenses further underscores the seriousness of the defendant's conduct. The defendant used multiple shell companies, fraudulent documents, and fake technology services agreements to keep his OTC cryptocurrency exchange operating. He, at times, added layers of obfuscation by transferring the converted fiat currency between his shell companies before transferring the funds to Colombia. And, as described above, he used others to pose as the "owners" of some of the shell companies.

The defendant's conduct caused real harm—facilitating unlawful enterprises, undermining the integrity of the U.S. financial system, and impeding the ability of law enforcement to trace ill-gotten funds. For all of these reasons, a sentence including a substantial term of imprisonment is warranted.

### 2. The Need to Afford Adequate Deterrence to Criminal Conduct

The defendant's actions during the course of the charged offenses further demonstrate that a substantial sentence is necessary in order to protect the public from additional crimes of the defendant. *See* 18 U.S.C. § 3553(a)(2)(C). As an initial matter, the defendant was undeterred from participating in this conduct despite his prior interactions with the DEA and a federal prosecutor's office. As the Probation Office points out, "the repeated, complex, and long-term nature of Cartier's behavior" is particularly troublesome. (PSR at 38). The repeated nature of the defendant's conduct, along with the fact that he was undeterred by his prior interactions with federal authorities, contradicts his arguments that he was only doing business with clients he "verified." First, as explained in more detail below, the defendant's know-your-customer ("KYC") process fell well short of what was required of MSBs and, despite his claims otherwise, the defendant did not run KYC on most of his customers prior to working with them. Second, the defendant knew full well that others—like himself—were concealing the true nature of their businesses, by, among other things, using shell companies, using straw owners, creating fraudulent documents, and otherwise lying about the source of funds. The defendant, therefore, had no reason to believe that the materials he received for his "KYC process" were legitimate since the defendant and others in the Network operated and designed their companies to circumvent such controls. Concerningly, but for law enforcement intervention, the defendant would have continued laundering criminal proceeds for the Network. Therefore, a substantial term of imprisonment is necessary to deter the defendant from committing similar crimes in the future.

A substantial term of imprisonment is also necessary to adequately deter other sophisticated criminals like the defendant from similar criminal conduct. *See* 18 U.S.C. § 3553(a)(2)(B). As the Court is aware, detecting sophisticated fraud and money laundering operations like the defendant's is difficult. The investigation and prosecution of these offenses requires significant time and resources, especially where, as described above, the defendant made it difficult to detect his scheme timely or to uncover its full scope. This is also particularly true for laundering drug money, where the launderers are rarely directly involved in the distribution of narcotics. For this reason, others similarly situated to the defendant may be convinced that the

Government lacks the resources to prosecute their wrongdoing and that they will not face serious punishment for their crimes. A substantial sentence is therefore necessary to send a powerful message about the consequences of making easy cash by using businesses as a cover for fraud and money laundering offenses. *See, e.g.*, *United States v. Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it."); *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) ("Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." (internal quotation marks omitted)); *United States v. Mueffelman*, 470 F.3d 33, 40 (1st Cir. 2006) (deterrence of white-collar crime is "of central concern to Congress").

### 3.   The Defendant's History and Characteristics

The history and characteristics of the defendant further support the requested sentence. *See* 18 U.S.C. §§ 3553(a)(1). The defendant, a direct descendant of the Cartier family known for luxury jewelry, grew up in an affluent family. (*See* PSR ¶¶ 12, 95). He traveled the world, attended college in Switzerland, was an aspiring singer, and ran multiple successful companies. (*See* PSR ¶¶ 97, 112-14; Def. Mem. at 7-13). Nevertheless, the defendant laundered money—day in and day out—for six years. He did so in sophisticated ways, repeatedly finding new ways to continue the money laundering operations even after multiple banks closed multiple accounts for his shell companies, and despite the fact that the DEA seized three of his accounts. Indeed, it is apparent that he spent significant time thinking about how to conceal what he was doing, creating multiple companies, creating fraudulent documents, and using phony contracts. The defendant could have chosen a path in which he directed his energy toward legitimate activities and led a law-abiding life. Instead, the defendant chose, time and again, to take advantage of opportunities to further enrich himself by participating in extensive, sophisticated fraud and money laundering operations.

Contrary to his self-portrayal as a long-suffering everyman in his sentencing memorandum, the defendant had wealth and privilege that few attain.  He should not be treated any more favorably than the countless other defendants whom this Court routinely sentences to prison for equally self-interested conduct.  As Judge Colleen McMahon explained in *United States v. Binday*, No. 12 Cr. 152 (CM), a case that involved an insurance fraud scheme where the defendant was sentenced to 144 months' imprisonment, "[o]nly if white collar crime is punished commensurate with the damage it inflicts on society will citizens actually believe that the law metes out equal right to the poor and to the rich, which words are the cornerstone of the judicial oath."  (ECF No. 349, Sent'g Tr., at 46); *see id.* at 45 ("There are crimes for which a critically important component of sentencing should be to send a message to the community, for the industry that this kind of behavior is intolerable, and to send a message to the community and to the industry that this sort of behavior is every bit as reprehensible as the types of crimes for which I and others like me routinely send poor, disadvantaged persons to prison for dozens of years."); *see also United States v. Gupta*, 904 F. Supp. 2d 349, 355 (S.D.N.Y. 2012) ("While no defendant should be made a martyr to public passion, meaningful punishment is still necessary to reaffirm society's deep-seated need to see justice triumphant.  No sentence of probation, or anything close to it, could serve this purpose.").

### C. The Defendant's Arguments Are Without Merit

In his sentencing submission, the defendant acknowledges that he engaged in the offenses for multiple years, but downplays the nature and severity of the offense claiming that "[a]t worst, he turned a blind eye to the possibility that the cryptocurrency he transacted in was tied to some illegal activity," and that there were "no identifiable victims" of his conduct. Interviews of witnesses and a review of the records tell a very different story—of an experienced businessman who created a web of U.S. shell companies; used others as the front for those companies, including a young man who considered him an uncle; disregarded professional advice on how these companies needed to comply with the law by creating effective policies and procedures; created phony documents to cover-up his activities to deceive banks and law enforcement; and continued engaging in this conduct even after he had funds seized by the DEA.

The defendant's criminal conduct also imposed a significant societal harm. "Title 18 U.S.C. § 1960 was enacted in order to combat the growing use of money transmitting businesses to transfer large amounts of the monetary proceeds of unlawful enterprises." *United States v. Velastegui*, 199 F.3d 590, 593 (2d Cir. 1999). The illegal movement of crime proceeds causes significant harm "to law enforcement's efforts to detect the use and production of ill-gotten gains." *United States v. Allen*, 76 F.3d 1348, 1369 (5th Cir. 1996). "This is so because the harm from such a transaction does not generally fall upon an individual, but falls upon society in general." *United States v. Thompson*, 40 F.3d 48, 51 (3d Cir. 1994) (citation and alteration omitted). "Each unlawful monetary transaction harms society by impeding law enforcement's efforts to track ill-gotten gains." *United States v. Martin*, 320 F.3d 1223, 1227 (11th Cir. 2003). As these authorities have recognized, the defendant's offense conduct imperiled the integrity of the U.S. financial system, causing harm to the public more broadly.

The Probation Office appropriately acknowledged this as well, explaining the "seriousness of the offense" was underscored by "the repeated, complex, and long term nature of Cartier's behavior." (PSR at 38). "The defendant's actions served to facilitate the illicit laundering of a significant sum of money, with his knowledge that the funds included proceeds from illicit activity." This was not aberrational conduct by someone young and inexperienced, the defendant's criminal activity was "his primary source of income from 2018 until his arrest." (*Id.*).

In addition to downplaying what he did and how he did it, the defendant seeks a time served sentence principally on several other grounds.

*First*, the defendant asserts that the need to "avoid unwarranted disparities" among defendants with similar records who have been found guilty of similar conduct, 18 U.S.C. § 3553(a)(6), warrants a sentence of time served in this case. (Def. Mem. 25-30). The cases cited by the defendant do not support the relief he seeks. Several of them involve a plea to a single count of violating 18 U.S.C. § 1960, or a single count of violating the BSA, with a statutory cap of five years' imprisonment, in contrast to the defendant who has pled guilty to both unlicensed money transmitting as well as bank fraud. (Def. Mem. 25-30- citing *United States v. Legkodymov, United States v. Hayes*, *United States v. Zhao, United States v. Rodriguez, and United States v. Hill*). Here, while there are an insufficient number of comparable defendants for the Judiciary Sentencing Information data to draw any comparison, notably absent from the defendant's sentencing submission was recognition of other cryptocurrency cases where a significantly more substantial

sentence were imposed. *See United States v. Roman Sterlingov,* No. 21 Cr. 399 (RDM), (D.D.C. Nov. 8, 2024), Dkt. 340 (Judgment) (12.5-year sentence, following his trial conviction, of Roman Sterlingov, the operator of the Bitcoin Fog cryptocurrency mixer); *United States v. Arthur Budovsky*, No. 13 Cr. 368 (DLC), (S.D.N.Y. May 6, 2016), Dkt. 382 (Sentencing Tr.) (20-year sentence of Liberty Reserve founder Arthur Budovsky). While no other case is a perfect comparator, these cases emphasize that defendants who engaged in long-running criminal schemes involving the knowing transmission of hundreds of millions in crime proceeds have repeatedly received sentences far steeper than the defendant requests.

None of this is to say that this Court should reflexively impose the same or a similar sentence to that imposed in other cases. The defendant should be sentenced for who he is and what he has done, regardless of the sentences imposed in other cases. But to the extent that the defendant has asked this Court to consider specific other cases, they do not support his extraordinary request.

*Second*, the defendant argues the Guidelines do not appropriately reflect the harm of his crime because the defendant simply "was trying to build a business, in a challenging environment where the regulations and laws were still in the process of being written, as is evidenced by the ongoing debate over the Clarity Act." (Def. Mem. 33). As the Second Circuit recently recognized, "exchanging [cryptocurrency] and cash falls squarely within the statutory and regulatory definitions of a money transmitting business." *United States v. Goklu*, No. 24-cr-767, --- F.4th ---, 2026 WL 932952, at \*6 (April 7, 2026). Indeed, the defendant was advised by multiple professionals that before transacting with any business he needed to register, obtain licenses, and comply with the BSA, including implementing an effective AML program. There was no ambiguity about the defendant's obligations, as he has admitted. His conduct unambiguously constituted money transmission, and there is nothing about the evolving cryptocurrency regulatory environment that warrants mitigation. Moreover, the defendant's argument ignores that a substantial portion of his business involved transmitting illegal narcotics proceeds—an aspect of his operations entirely inconsistent with the argument that he was merely trying to build a legitimate business.

*Third*, the defendant argues that a downward variance is appropriate in light of the purportedly "horrific conditions" he experienced during pretrial detention at the Metropolitan Detention Center ("MDC"). (Def. Mem. 35). While the Court can and should take pretrial detention circumstances into account in fashioning an appropriate sentence, MDC conditions do not justify the variance the defendant seeks. *See United States v. Mejias*, 24 Cr. 149, Dkt. No. 25, Sent. Tr. at 17-18, (LJL) (S.D.N.Y. Aug. 7, 2024) (expressing skepticism about the relevance of the conditions at the MDC to the incapacitation and public safety elements of the purposes of sentencing). And while a number of courts in this District have previously found that the conditions at the MDC needed significant improvement, the MDC has taken serious steps to address those issues and has steadily improved conditions, increasing staffing levels and addressing persistent medical issues.

Indeed, Judge Furman, who more than two years ago described the conditions at the MDC as "dreadful," has recognized the MDC's much-improved conditions. *United States v. Chavez*, 22 Cr. 303 (JMF), 2024 WL 50233, at \*1 (S.D.N.Y. Jan. 4, 2024). More specifically, Judge Furman observed almost a year ago that conditions at MDC are "a lot better than when I wrote my opinion in *United States v. Chavez*," including with regard to staffing levels, medical services, and

incidents of violence. *United States. v. Reshard*, 24 Cr. 392, Dkt. No. 38, Sent. Tr. at 24, (JMF) (S.D.N.Y. May 14, 2025). Other judges have also noted the improved conditions, including Judge Caproni who wrote that the "MDC is improving every day." *United States v. Villamizar*, 24 Mag. 4261, Dkt. No. 6, Tr. 15 (UA) (VEC), (S.D.N.Y. Dec. 10, 2024); *see also, United States. v. Alexander*, 24 Cr. 676, Dkt. No. 37, Tr. 125, (VEC) (S.D.N.Y. Jan. 16, 2025) ("The horror stories from a year ago [at the MDC], it's not the [same] facility. They have a lot more staff. . . . They're doing the best they can."). Against this background of institutional improvement, the defendant's time at the MDC should not materially alter the sentence the Court should impose here.

*Finally*, the defendant argues that a significant sentence is unnecessary for purposes of deterrence. (Def. Mem. 37-39). Contrary to the defendant's attempt to downplay the value of deterrence, there is a substantial need for a significant sentence to serve the needs of general deterrence for multiple reasons, as discussed, above, including because the defendant's illegal operation—and others like—generate millions in fees even by the defendant's conservative calculations.[9] *See, e.g.*, *Cavera*, 550 F.3d at 196 ("Where the profits to be made from violating a law are higher, the penalty needs to be correspondingly higher to achieve the same amount of deterrence."). The Court should impose a sentence that deters anyone considering his example, who might otherwise be tempted to make millions through running a money transmitting business that assists an international money laundering network.

## III.    Conclusion

For the reasons set forth above, the Government respectfully requests that the Court impose a Guidelines sentence of 120 months' imprisonment.

Respectfully Submitted,

JAY CLAYTON
United States Attorney
Southern District of New York

By:___/s/_____
     Jennifer Ong
     Eli J. Mark
     David A. Markewitz
     Assistant United States Attorneys
     Southern District of New York

---

[9] The defendant estimates he only received a 0.5% commission (Def. Mem. 17), which is less than Government understands he made. But even utilizing the defendants' rate, he would have made millions (and this only accounts for the money he made from exchanging crypto to fiat, and not the other way around).