# EXHIBIT D

**MASTER PURCHASE AGREEMENT**

VC Innovated Technologies LLC, a Delaware limited liability company ("VC") and the Counterparty identified below ("Counterparty" and, together with VC, the "Parties" and each a "Party") are entering into this Master Purchase Agreement as of the date set forth below.

By signing below, Counterparty agrees to be bound by this Master Purchase Agreement, including the attached Terms of Business (Appendix I), the attached Settlement Terms (Appendix II) and the attached Supplemental Terms (Appendix III) (each of which Counterparty hereby acknowledges receiving), which are incorporated by reference herein, and represents that all information provided below is accurate and complete.

**BY SIGNING BELOW, COUNTERPARTY ACKNOWLEDGES THAT THE MASTER PURCHASE AGREEMENT CONTAINS A PRE-DISPUTE ARBITRATION CLAUSE IN SECTION 5.5 OF THE TERMS OF BUSINESS AND THAT COUNTERPARTY HAS RECEIVED, READ, UNDERSTOOD, AND AGREED TO THE TERMS THEREOF.**

The individual signing below represents and warrants to VC that he or she is duly authorized and has legal capacity to execute and deliver this Master Purchase Agreement.

Counterparty Name: ███████████████████

Signature: ███████████████████

Name: ███████████████

Title: _____

Date: _____

Counterparty Address for Notices:

Address: ████████████████████ _____
Attention ████████████████████ _____
Email: ███████████████████████ _____

Jurisdiction in which Counterparty
was organized/formed (if applicable):

Counterparty type of entity (corporation,
limited liability company, etc.) (if applicable):

ACKNOWLEDGED AND AGREED:

VC INNOVATED TECHNOLOGIES LLC

By: _____

Name: Maximilien de Hoop Cartier
Title: Director

VCTECH000296

# APPENDIX I
# TERMS OF BUSINESS

DEFINITIONS

Section 1.1 Definitions. In addition to the capitalized terms defined elsewhere in this Agreement, the following capitalized terms shall have the meanings specified in this Section 1.1:

"Agreement" shall mean, collectively, the Master Purchase Agreement completed and executed by Counterparty, including these Terms of Business, the Settlement Terms set forth as Appendix II and the Supplemental Terms set forth as Appendix III.

"Business Day" shall mean any day which is not a Saturday or Sunday or a bank holiday in the United States.

"Counterparty Purchased Cryptocurrency" shall mean, with respect to a transaction in which VC is selling cryptocurrency to Counterparty, the number of units of such cryptocurrency to be sold.

"Counterparty Purchase Price" shall mean, with respect to a transaction in which VC is selling cryptocurrency to Counterparty, the price to be paid by Counterparty to VC for the relevant Counterparty Purchased Cryptocurrency, which purchase price may be denominated in a fiat currency or another cryptocurrency.

"Counterparty Wallet" shall mean the applicable location, wallet, address, account or storage device designated by Counterparty for delivery of cryptocurrencies.

"VC Purchased Cryptocurrency" shall mean, with respect to a transaction in which VC is purchasing cryptocurrency from Counterparty, the number of units of such cryptocurrency to be purchased.

"VC Purchase Price" shall mean, with respect to a transaction in which VC is purchasing cryptocurrency from Counterparty, the price to be paid by VC to Counterparty for the relevant VC Purchased Cryptocurrency, which purchase price may be denominated in a fiat currency or another cryptocurrency.

"VC Wallet" shall mean the applicable location, wallet, address, account or storage device designated by VC for delivery of cryptocurrencies.

"Foreign Bank" shall mean an organization that (i) is organized under the laws of a foreign country, (ii) engages in the business of banking, (iii) is recognized as a bank by the bank supervisory or monetary authority of the country of its organization or principal banking operations, (iv) receives deposits to a substantial extent in the regular course of its business, and (v) has the power to accept demand deposits, but does not include the U.S. branches or agencies of a foreign bank.

"Foreign Shell Bank" shall mean a Foreign Bank without a Physical Presence in any country, but does not include a regulated affiliate.

"Non-Cooperative Jurisdiction" shall mean any country or territory that has been designated as non- cooperative with international anti-money laundering principles or procedures by an intergovernmental group or organization, such as the Financial

VCTECH000297

Action Task Force on Money Laundering ("FATF"), of which the United States is a member and with which designation the United States representative to the group or organization continues to concur. See http://www.fatf-gafi.org for FATF's list of non-cooperative countries and territories.

"OFAC" shall mean the United States Office of Foreign Assets Control. The lists of OFAC prohibited countries, territories, persons and entities can be found on the OFAC website at http://www.treas.gov/offices/enforcement/ofac/.

"Person" shall mean any individual, corporation, partnership, association, limited liability company, trust, estate or other entity, either individually or collectively.

"Physical Presence" shall mean a place of business that is maintained by a Foreign Bank and is located at a fixed address, other than solely a post office box or an electronic address, in a country in which the Foreign Bank is authorized to conduct banking activities, at which location the Foreign Bank (i) employs one or more individuals on a full-time basis, (ii) maintains operating records related to its banking activities, and (iii) is subject to inspection by the banking authority that licensed the Foreign Bank to conduct banking activities.

## SALE AND PURCHASE OF THE PURCHASED CRYPTOCURRENCY

Section 2.1   Trade Request. During the term of this Agreement and at such times as mutually agreed by the Parties, the Parties may effect transactions in cryptocurrency in accordance with the following procedures:

(a) Counterparty may submit to VC, via electronic and/or telephonic communication, a request to purchase or sell a specified cryptocurrency (a "Trade Request") on either a spot or forward basis.

(b) Upon receipt of a Trade Request, VC may provide to Counterparty, via electronic and/or telephonic communication, a price (which may be denominated in a fiat currency or another cryptocurrency) at which it is willing to sell or purchase (as the case may be) a specified quantity of such cryptocurrency (a "VC Quote").

(c) Counterparty must accept a VC Quote by electronic and/or telephonic communication within ten (10) seconds of the time the electronic communication is sent or the time of the telephonic communication (the "Acceptance Window"); provided, however, that VC may withdraw a VC Quote by electronic or telephonic communication at any time prior to acceptance.

(d) If Counterparty accepts the VC Quote within the Acceptance Window, a binding transaction will be deemed to have been executed at the time of acceptance (the "Time of Acceptance"), on the terms set forth in the VC Quote (a "Completed Trade").

(e) If the VC Quote is not accepted within the Acceptance Window, the VC Quote shall be deemed to be rejected and expire and no transaction may be effected in accordance with such VC Quote.

(f) Following the execution of a Completed Trade, VC shall send to Counterparty a summary of the terms of the Completed Trade including the following information: (i) the type of cryptocurrency to be purchased or sold; (ii) whether VC is selling or purchasing the relevant cryptocurrency; (iii) the Counterparty Delivery Time, if the

VCTECH000298

Completed Trade is a forward trade; (iv) where VC is selling the relevant cryptocurrency, the Counterparty Purchased Cryptocurrency and the Counterparty Purchase Price; and (v) where VC is purchasing the relevant cryptocurrency, the VC Purchased Cryptocurrency and the VC Purchase Price. The Parties acknowledge and agree that the failure of VC to send such summary shall not affect the validity of a Completed Trade.

(g) If VC determines that a VC Quote contained an obvious error with respect to the price or amount of cryptocurrency set forth therein, then VC shall have the right to cancel the Completed Trade based upon such VC Quote by delivering notice to Counterparty within two (2) minutes after Counterparty's acceptance of such VC Quote in accordance with Section 2.1(d).

Section 2.2 Purchase and Sale. For each Completed Trade, Counterparty or VC, as the case may be, will sell, transfer and deliver, and the other Party will purchase, all right, title and interest in and to the VC Purchased Cryptocurrency or the Counterparty Purchased Cryptocurrency, respectively, in accordance with the Settlement Terms set forth in Appendix II.

Section 2.3 Term. This Agreement shall remain in effect until terminated in writing by either Party; provided, however, that any termination shall not affect the Parties' obligations with respect to any Completed Trades entered into prior to such termination.

REPRESENTATIONS AND WARRANTIES

Section 3.1 VC Representations and Warranties. VC represents and warrants to Counterparty as follows, which representations and warranties shall be deemed to be continuing during the term of this Agreement:

(a) VC is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware. VC has all necessary limited liability company power and authority to enter into this Agreement, to carry out its obligations hereunder and to consummate the transactions contemplated hereby. The execution and delivery by VC of this Agreement, the performance by VC of its obligations hereunder and the consummation by VC of the transactions contemplated hereby have been duly authorized by all requisite company action on the part of VC.

(b) This Agreement has been duly delivered by VC and (assuming due authorization, execution and delivery by Counterparty) constitutes a valid and legally binding obligation of VC, enforceable against VC in accordance with its terms, except as limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, and any other laws of general application affecting enforcement of creditors' rights generally.

(c) Neither the delivery of this Agreement, nor the consummation of the transactions contemplated hereby, does or will violate any statute, regulation, rule, judgment, order, decree, ruling, charge or other restriction of any government, governmental agency, or court to which VC is subject or conflict with, violate or constitute a default under any agreement, debt or other instrument to which VC is a party.

(d) Neither VC, nor any Person who controls VC or any Person for whom VC is acting as an agent or nominee, as applicable (i) bears a name that appears on the List

VCTECH000299

of Specially Designated Nationals and Blocked Persons maintained by OFAC from time to time; (ii) is a Foreign Shell Bank; or (iii) resides in or transfers funds from or through an account in a Non- Cooperative Jurisdiction.

(e) With respect to any Counterparty Purchased Cryptocurrency that VC sells, transfers and delivers to Counterparty under any Trade Request, VC is the lawful owner of such Counterparty Purchased Cryptocurrency with good and marketable title thereto, and VC has the absolute right to sell, assign, convey, transfer and deliver such Counterparty Purchased Cryptocurrency. Such Counterparty Purchased Cryptocurrency is free and clear of any and all security interests, liens, pledges, claims (pending or threatened), charges, escrows, encumbrances or similar rights.

(f) VC is the lawful owner of each VC Wallet, and has good title thereto. Each VC Wallet is owned and operated solely for the benefit of VC, and no Person, other than VC, has any right, title or interest in any VC Wallet.

Section 3.2 Counterparty Representations and Warranties. Counterparty hereby represents and warrants to VC as follows, which representations and warranties shall be deemed to be continuing during the term of this Agreement:

(a) The information relating to Counterparty set forth in this Agreement is true and complete in all respects, except to the extent that Counterparty has provided notice of any change to VC.

(b) If Counterparty is not a natural person, Counterparty is validly existing and in good standing under the laws of the jurisdiction in which it was formed. Counterparty has all necessary power and authority to enter into this Agreement, to carry out its obligations hereunder and to consummate the transactions contemplated hereby. If Counterparty is not a natural person, the execution and delivery by Counterparty of this Agreement, the performance by Counterparty of its obligations hereunder and the consummation by Counterparty of the transactions contemplated hereby have been duly authorized by all requisite action on the part of Counterparty.

(c) This Agreement has been duly executed and delivered by Counterparty and (assuming due authorization, execution and delivery by VC) constitutes a valid and legally binding obligation of Counterparty, enforceable against Counterparty in accordance with its terms, except as limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, and any other laws of general application affecting enforcement of creditors' rights generally.

(d) Neither the execution and delivery of this Agreement, nor the consummation of the transactions contemplated hereby, does or will violate any statute, regulation, rule, judgment, order, decree, ruling, charge or other restriction of any government, governmental agency, or court to which Counterparty is subject or conflict with, violate or constitute a default under any agreement, debt or other instrument to which Counterparty is a party.

(e) Neither Counterparty (nor, if Counterparty is not a natural person, any Person who controls Counterparty) or any Person for whom Counterparty is acting as an agent or nominee, as applicable (i) bears a name that appears on the List of Specially Designated Nationals and Blocked Persons maintained by OFAC from time to time; (ii) is a Foreign Shell Bank; or (iii) resides in or transfers funds from or through an account in a Non- Cooperative Jurisdiction.

(f) With respect to any VC Purchased Cryptocurrency that Counterparty sells, transfers and delivers to VC under any Trade Request, Counterparty is the lawful

VCTECH000300

owner of such VC Purchased Cryptocurrency with good and marketable title thereto, and Counterparty has the absolute right to sell, assign, convey, transfer and deliver such VC Purchased Cryptocurrency. Such VC Purchased Cryptocurrency is free and clear of any and all security interests, liens, pledges, claims (pending or threatened), charges, escrows, encumbrances or similar rights.

(g) Counterparty is the lawful owner of each Counterparty Wallet, and has good title thereto. Each Counterparty Wallet is owned and operated solely for the benefit of Counterparty, and no Person, other than Counterparty, has any right, title or interest in any Counterparty Wallet.

(h) No agent, broker, finder or other third party acting on behalf of Counterparty is or will be entitled to any brokers' or finders' fee or any other commission or similar fee from VC in connection with the transactions contemplated by this Agreement.

(d) In entering into any transaction subject to this Agreement, Counterparty has not relied on any statement or other representation of VC other than as expressly set forth herein.

EVENTS OF DEFAULT

Section 4.1 Events of Default. Each of the following shall be deemed an "Event of Default" by Counterparty:

(a) Counterparty fails to comply with any provision of, or perform any obligation under, this Agreement, including an obligation to deliver to VC the Counterparty Purchase Price or the VC Purchased Cryptocurrency, as the case may be, in connection with any Completed Trade by the relevant Counterparty Delivery Time;

(b) Any representation or warranty made by Counterparty is not or ceases to be true or correct in any material respect;

(c) Counterparty has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation, and such proceeding or petition is instituted and either (i) results in a judgment of insolvency or bankruptcy or the entry of an order for relief of the making of an order for its winding-up or liquidation, or (ii) is not dismissed, discharged, stayed or restrained, in each case within sixty (60) days of the institution or presentation thereof;

(d) Counterparty states that it is unable to pay its debts upon maturation; or

(e) Any regulatory authority with jurisdiction over Counterparty suspends the conduct of Counterparty's usual business or revokes any material authorizations, memberships, licenses or other similar approvals.

Section 4.2 Remedies. Upon the occurrence of an Event of Default, VC shall have the right, in its sole discretion, to take any of the following actions:

(a) Cancel and terminate any Completed Trade that has not yet settled and require Counterparty to pay VC an amount reasonably determined by VC to compensate it for any and all losses, costs, expenses, and fees incurred in connection with such cancelled trade, including any loss of bargain,

Section 3.3 Counterparty agrees, understands and acknowledges that:

VCTECH000301

(a) VC engages in the bilateral purchase and sale of cryptocurrencies, including any such transactions contemplated by this Agreement, solely on a proprietary basis for its own account and if VC transacts with Counterparty, it does so solely on a bilateral basis.

(b) VC is not providing and will not provide any fiduciary, advisory, exchange or other similar services to Counterparty or any Person related to or affiliated with Counterparty, or in connection with any transaction subject to this Agreement.

(c) Counterparty is solely responsible for any decision to enter into a transaction subject to this Agreement, including the evaluation of any and all risks related to any such transaction.

cost of funding, or loss or cost incurred as a result of its terminating, liquidating, obtaining or re-establishing any hedge or related trading position.

(b) Set off and net any obligations of VC to Counterparty against any obligations of Counterparty to VC;

(c) Terminate any or all of VC's obligations for future performance to Counterparty; and

(d) Take such other actions as VC, in its sole discretion, deems necessary or appropriate for its protection, all without notice or advertisement.

## MISCELLANEOUS

Section 5.1 Amendments, Waivers. Counterparty agrees that VC may amend the provisions of this Agreement at any time upon fifteen (15) days' notice to Counterparty. Counterparty acknowledges and agrees that by continuing to trade with VC after such notice period, Counterparty accepts any such amendments to this Agreement. This Agreement may not be otherwise amended without the prior written consent of VC. No consent with respect to any action or omission by a Party shall operate as a consent to, waiver of, or estoppel with respect to, any other or subsequent action or omission. No failure to exercise and no delay in exercising any right, remedy or power hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right, remedy or power hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy or power provided herein or by law or at equity.

Section 5.2 Assignment; Successors and Assigns.
This Agreement shall be binding on and inure to the benefit of the Parties and their respective successors, heirs, personal representatives, and permitted assigns. Counterparty may not assign or delegate its rights or obligations hereunder without the prior written consent of VC, which may be withheld in VC's sole discretion.

Section 5.3 Severability. Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be prohibited by or invalid under applicable law, such provision will be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of this Agreement.

Section 5.4 Descriptive Headings and Construction. The descriptive headings of this Agreement are inserted for convenience only and do not constitute a part of this

VCTECH000302

Agreement. Unless otherwise indicated, references to Sections herein are references to Sections of this Agreement.

Section 5.5 Governing Law; Venue; Waiver of Jury Trial.

(a) This Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to the principles of conflicts of law thereof. Subject to Section 5.5(b), each Party hereby agrees that (i) any and all litigation arising out of this Agreement shall be conducted only in state or federal courts located in the State of Illinois, and (ii) such courts shall have the exclusive jurisdiction to hear and decide such matters. EACH PARTY HEREBY EXPRESSLY WAIVES ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER MATTER INVOLVING THE PARTIES, AND AGREES THAT ANY SUCH ACTION SHALL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY.

(b) Notwithstanding anything to the contrary contained in Section 5.5(a), Counterparty hereby agrees that VC shall have the right to elect to arbitrate and compel arbitration of any dispute hereunder through final and binding arbitration before JAMS (or its successor) ("JAMS"). VC may commence the arbitration process by filing a written demand for arbitration with JAMS, with a copy to Counterparty; provided, however, that either Party may, without inconsistency with this arbitration provision, apply to any court in accordance with Section 5.5(a) and seek injunctive relief until the arbitration award is rendered or the controversy is otherwise resolved. Any arbitration to be conducted pursuant to this Section 5.5(b) will be conducted in Chicago, Illinois by one neutral arbitrator operating and appointed from the JAMS panel of neutrals in accordance with the provisions of JAMS Streamlined Arbitration Rules and Procedures in effect at the time the demand for arbitration is filed. The arbitrator shall have the authority to award any remedy or relief that a court of competent jurisdiction could order or grant, including the issuance of an injunction; provided, however, that the arbitration award shall not include factual findings or conclusions of law and no punitive damages shall be awarded. The fees and expenses of such arbitration

(c) Each Party irrevocably and unconditionally hereby submits to the personal jurisdiction of such courts described in Section 5.5(a) and/or JAMS arbitration described in Section 5.5(b) and waives any objection such Party may now or hereafter have to venue or that such courts and/or JAMS arbitration are inconvenient forums.

Section 5.6 Confidentiality. Counterparty hereby agrees to not disclose, and to otherwise keep confidential, the transactions contemplated hereby ("Confidential Information"). If Counterparty is required by law, rule or regulation to disclose any Confidential Information, Counterparty will, to the extent legally permissible, provide VC with prompt written notice of such requirement so that VC may seek an appropriate protective order or waive compliance with this Section 5.6. VC shall promptly respond to such request in writing by either authorizing the disclosure or advising of its election to seek such a protective order, or, if VC fails to respond promptly, such disclosure shall be deemed approved. Counterparty hereby further agrees to not make any public announcement, public statement or advertisement relating to the relationship of the Parties or the fact that the Parties engaged in any transaction without the prior written consent of VC. The confidentiality obligations set forth in this Section 5.6 shall survive the termination or expiration of this Agreement.

VCTECH000303

Section 5.7 Entire Agreement. This Agreement and each Trade Request executed on or after the date hereof contain the entire agreement among the Parties with respect to the subject matter hereof and supersede all prior agreements and understandings, written or oral, among the Parties with respect thereto. Without limiting the generality of the foregoing, this Agreement supersedes and replaces in its entirety any Cryptocurrency Master Purchase Agreement previously entered into between the Parties.

Section 5.8 Counterparts. This Agreement may be executed in one or more counterparts, each of which when so executed and delivered shall be an original, but all such counterparts taken together shall constitute one and the same instrument. Transmission by telecopy, email or other form of electronic transmission of an executed counterpart of this Agreement shall be deemed to constitute due and sufficient execution and delivery of such counterpart.

Section 5.9 Notices, Consents, etc. Any notices, consents or other communications required or permitted to be sent or given hereunder by either of the Parties shall in every case be in writing and shall be deemed properly served if (i) delivered personally, (ii) sent by registered or certified mail, in all such cases with first class postage prepaid, return receipt requested, (iii) delivered by a recognized overnight courier service or (d) sent via email, to the Parties, at the addresses as set forth below or at such other addresses as may be furnished in writing.

(a) If to VC, to:

VC Innovated Technologies LLC
16192 Coastal Highway,
19958 Lewes, Delaware
Attention: General Counsel
Email: ███████████████████████████

(b) If to Counterparty, to the address for notices set forth by Counterparty on the Master Purchase Agreement executed by Counterparty.

Date of service of such notice shall be (w) the date such notice is personally delivered or sent by email, (x) three (3) Business Days after the date of mailing if sent by certified or registered mail, or (y) one

(1) Business Day after date of delivery to the overnight courier if sent by overnight courier.

Section 5.10 Authorized Persons. If Counterparty is not a natural person, Counterparty agrees that VC may rely on, and Counterparty shall be bound by, any notice, Trade Request or other communication provided by any person that VC reasonably believes is authorized by Counterparty to provide such notice, Trade Request or other communication, whether or not such person has actual authority to do so on behalf of Counterparty.

Section 5.11 No Third Party Beneficiary. The terms and provisions of this Agreement are intended solely for the benefit of each Party and their respective successors or permitted assigns, and it is not the intention of the Parties to confer third-party beneficiary rights upon any other Person.

VCTECH000304

**APPENDIX II**
**SETTLEMENT TERMS**

The Parties shall settle each Completed Trade in accordance with the following settlement terms:

(a) By no later than the Counterparty Delivery Time (i) if Counterparty is purchasing the Counterparty Purchased Cryptocurrency from VC, then Counterparty shall transfer, or cause to be transferred, the Counterparty Purchase Price to VC by transfer of immediately available funds to the account designated by VC or cryptocurrencies on the applicable Cryptocurrency Network to the applicable VC Wallet or (ii) if VC is purchasing the VC Purchased Cryptocurrency from Counterparty, then Counterparty shall deliver, or cause to be delivered, the VC Purchased Cryptocurrency to VC by transfer of immediately available cryptocurrencies on the applicable Cryptocurrency Network to the applicable VC Wallet. Counterparty agrees and acknowledges that with respect to any and all wire transfers from Counterparty or on behalf of Counterparty to VC, the name on the originating account must match exactly the Counterparty name as provided by Counterparty to VC and if it does not, VC reserves the right to reject the wire transfer.

(b) As promptly as is reasonably practicable following receipt of the Counterparty Purchase Price or receipt of the VC Purchased Cryptocurrency by VC (i) if Counterparty is purchasing the Counterparty Purchased Cryptocurrency from VC, then VC shall deliver, or cause to be delivered, the Counterparty Purchased Cryptocurrency to Counterparty by transfer of cryptocurrencies on the applicable Cryptocurrency Network to the applicable Counterparty Wallet or (ii) if VC is purchasing the VC Purchased Cryptocurrency from Counterparty, then VC shall transfer or cause to be transferred, the VC Purchase Price to Counterparty by transfer of immediately available funds to the account designated by Counterparty or cryptocurrencies on the applicable Cryptocurrency Network to the applicable Counterparty Wallet.

(c) If on any Settlement Date, the Parties have payment and delivery obligations with respect to multiple Completed Trades in the same cryptocurrency, VC may net such Completed

Trades against each other as follows: (i) any VC Purchased Cryptocurrency that Counterparty is required to deliver will be netted against any Counterparty Purchased Cryptocurrency that VC is required to deliver; (ii) any Counterparty Purchase Price that Counterparty is required to pay will be netted against any VC Purchase Price that VC is required to pay; and (iii) a net number of units of the relevant cryptocurrency will be delivered by one Party against a net purchase price to be paid by the other Party.

In addition to the capitalized terms defined elsewhere in the Agreement, capitalized terms in this Appendix II shall have the following meanings:

"Counterparty Bank" shall mean the bank identified by Counterparty as part of VC's onboarding procedures, or such other bank as the Parties may mutually agree.

"Counterparty Delivery Time" shall mean: (i) if the Completed Trade is a spot trade and Counterparty is delivering cryptocurrency, then twenty four (24) hours after the Time of Acceptance; (ii) if the Completed Trade is a spot trade, Counterparty is delivering fiat currency, and the Time of Acceptance occurs before 2:00 p.m. Local

VCTECH000305

Time on a Local Business Day, then 5:00 p.m. Local Time on the same day; (iii) if the Completed Trade is a spot trade, Counterparty is delivering fiat currency, and the Time of Acceptance occurs at or after 2:00 p.m. Local Time on a Local Business Day or on a day that is not a Local Business Day, then 2:00 p.m. Local Time on the following Local Business Day; and (iv) if the Completed Trade is a forward trade, then 2:00 p.m. Central Time on the day specified in the applicable VC Quote, or at such other time mutually agreed upon by the Parties.

"Cryptocurrency Network" shall mean the peer-to- peer computer network that governs the transfer of the applicable cryptocurrency.

"Local Business Day" shall mean a day other than Saturday or Sunday on which the Counterparty Bank is open for business.

"Local Time" shall mean the time in the city where the Counterparty Bank is located, as specified in the information previously delivered by Counterparty to VC.

"Settlement Date" shall mean, with respect to a Completed Trade, the date upon which the transaction settles, which will be the same day that VC delivers to Counterparty the Counterparty Purchased Cryptocurrency or the VC Purchase Price, as applicable, pursuant to clause (b) above.

VCTECH000306

**APPENDIX III**
**SUPPLEMENTAL TERMS**

None.

VCTECH000307